PRUDHOMME v. CONTINENTAL CASUAL-
TY CO. et al.*

No. 5283.

Court of Appeal of Louisiana. Second
Circuit.

June 26, 1936.

148

Gordon Boswell, of New Orleans, Irion & Switzer, Malcolm Feist, and C. F. Currier, all of Shreveport, and R. E. Kerrigan, of New Orleans, for appellants.

Harry V. Booth, of Shreveport, for appellee.

TALIAFERRO, Judge.

Plaintiff was seriously injured when the Chevrolet coach automobile of L. D. Gibson, by him driven, wherein plaintiff was riding as an invited guest, collided with an automobile operated by defendant Harry Kaiser between sunset and dark on September 13, 1934, in the intersection of Louisiana Highways Nos. 10 and 80, a short distance north of Bossier City, La. Gibson was an employee of the Red River Motor Company, Inc., when the accident happened. He, his employer, and the carrier of its public liability insurance, the Columbia Casualty Company; and Kaiser and his insurer, the Continental Casualty Company, were all joined as defendants. The Gibson car was traveling south on highway No. 10 at not more than 40 miles per hour, while the Kaiser car was proceeding westerly on highway No. 80 at a speed, we think, slightly greater, when they collided. The impact occurred as both cars reached practically the center of the intersection. Each entered the intersection on its proper side of the highway. The area on all sides of the intersection is level and open, free of trees or other things which would affect clarity of vision, excepting some low weeds. Plaintiff, Gibson, and Kaiser all agree that there was no good reason why the occupants of each car did not see the other car as the intersection was neared. However, it is certain neither was observed by the other until they were only 20 feet apart.

Plaintiff alleges that he accompanied Gibson from Bossier City to Benton, 14 miles north of the intersection, as an invited guest; that Gibson made the trip to interview a prospective purchaser of a Chevrolet car, and that, after doing so, they started back toward Bossier City, their employer's headquarters, and did not turn aside before the accident occurred. He further alleges that the Gibson car was three-fourths across the intersection when suddenly and violently run into by the Kaiser car.

After alleging specific acts of negligence on the part of both car drivers, summarizing, plaintiff says that the sole and proximate cause of said collision, with its resultant injury and damage to him, is as follows:

That each of them failed to keep and maintain a proper lookout for vehicular traffic at said intersection and failed to reduce the speed of their cars as they approached the same, and failed to give any warning or signal of their approach thereto or of their intention to deliberately proceed into and across it; and did not heed "Stop" or "Slow" signs on said highways near the intersection. Kaiser is also charged with driving his car at an excessive rate of speed before reaching and as he entered the intersection.

Plaintiff details the character and extent of his injuries and sues for a total of $44,553 on that account.

The Red River Motor Company and its insurer, Columbia Casualty Company, answered jointly. Issuance by the latter of a policy of public liability insurance covering

all of the employees of the former is admitted. In all other respects, the substantial allegations of the petition are denied by these defendants. In the alternative, should it be held that Gibson was an employee or agent of the Red River Motor Company and/or if the court should hold that the automobile driven by him was within the coverage of said policy, all of which is denied—in that event, respondents aver that the accident was due entirely to the fault and negligence of said Kaiser, in this, to wit, the acts of negligence here charged to him are the same as charged by plaintiff, plus these:

That the said Kaiser entered the intersection at a speed of at least 50 miles per hour, which was an illegal and excessive rate of speed under the conditions and circumstances existing at that time and was violative of the statutes of the state of Louisiana; and that although the said Gibson had entered and pre-empted said intersection, the said Kaiser dangerously, recklessly, and carelessly entered the same.

If these alternative defenses are held to be not well founded, respondents, in the alternative, further aver that plaintiff was guilty of contributory negligence barring recovery by him, in these particulars:

In failing to protest against the manner in which he now alleges the said Gibson was driving the car in which he was riding, although said Prudhomme had ample opportunity and time to protest;

In failing to keep a proper lookout, failing to see the automobile of the said Kaiser, and in failing to warn said Gibson of its approach; and

In failing to see and call to the said Gibson's attention the signs which he now alleges were on Louisiana Highway No. 10 and which he admits he did not see.

Further, in the event all of the aforesaid alternative defenses are overruled, it is additionally averred that plaintiff cannot recover herein for the reason that on October 30, 1934, a few days after the accident, he furnished respondents a signed statement in which he asserted that he and Gibson were on a joint adventure immediately prior to and at the time of the accident, in that they were calling on parties together for their mutual interest and joint advantage, to wit, for the purpose of selling automobiles for their employer; and, accordingly, if this be true, Gibson's negligence is imputable to plaintiff. Defense based thereon is,

in the alternative, additionally urged in bar of plaintiff's recovery herein against these respondents, and that in said statements plaintiff further declared that he was entitled to workmen's compensation from respondents. It is averred that he was paid compensation for the period of disability, such payments being made upon faith in the truth of said declarations. On this account, in the alternative, estoppel is specially pleaded in bar of his right to recover against either of these respondents. It is also averred that said compensation payments were not made or received in error or mistake of law applicable to the facts as presented by plaintiff and corroborated by Gibson, but were made in response to proof submitted by plaintiff substantiating his contention that when the accident happened, he was performing services arising out of and in the course of his employment with the Red River Motor Company. In connection with the foregoing, it is finally averred that respondents were thereby precluded from contradicting and deprived of contending that plaintiff was not then and there performing the services of his employment, bringing him within the provisions of the Workmen's Compensation Law; and, accordingly, by said conduct, made apparent the obligation upon his employer and its insurer, respondents, to pay him the compensation he accepted from them.

They further aver that the liability of the Columbia Casualty Company under its policy is limited to $25,000 and, therefore, no judgment for a larger amount may be rendered against it.

Defendants Kaiser and Continental Casualty Company severed in their answers, but the same are practically identical. They deny that plaintiff was a guest of Gibson on the trip to and return from Benton, and aver that on said mission they were engaged in a joint adventure, the facts of which, as alleged, are the same as declared upon by the other defendants. These defendants charge that the sole and proximate cause of the accident was as follows:

That L. D. Gibson failed to keep a proper lookout for vehicle traffic at said intersection;

That said L. D. Gibson failed to stop his automobile at said intersection, or even to slow the speed thereof; and

That L. D. Gibson failed to give any warning or signal of his approach or his

intention to deliberately proceed into the intersection;

And that Gibson was then driving at a dangerous and excessive rate of speed, and failed to observe Kaiser's right of way.

They further aver that highway No. 80, commonly known as the "Dixie-Overland Highway," is a through highway, and traffic thereon has right of way over that on No. 10; that on said highway No. 10, at a reasonable distance from said intersection, there are and were at the time of the accident signs bearing the legend "Stop," the meaning of which was that traffic thereon should come to a stop before attempting to cross the intersection; that Gibson did not heed the warning these signs were intended to impress upon him; that Kaiser entered the intersection ahead of Gibson and anticipated, as was his right, that any car approaching the intersection on highway 10 would recognize the right of way to which he was entitled by law, before attempting to enter thereon. Further, in the alternative, contributory negligence on the part of plaintiff, barring recovery, is pleaded. This plea is predicated upon the same allegations of fact as is contained in the same plea urged by the Red River Motor Company and its insurer, supra. Repetition of these facts is unnecessary. Further, in the alternative, it is averred on information and belief that plaintiff since the date of his injury has been receiving compensation under the Employers' Liability Act of Louisiana (Act No. 20 of 1914, as amended) from his employer, or its insurer, at the rate of $20 per month; and in the event respondents are held liable to plaintiff herein for any amount, credit should be allowed them for the sum total of compensation paid to plaintiff.

It is averred by these respondents that the policy of insurance between them is limited to $5,000, and that the insurer may not be cast for any greater amount thereunder. In all other respects, the substantial allegations of the petition are denied.

Gibson did not answer. Issue as to him was joined by default.

After a lengthy trial, judgment was awarded plaintiff as follows:

$5,000 against all defendants, in solido; and $6,373.20 against all defendants, in solido, excepting the Continental Casualty Company, with interest thereon from judicial demand. There was also judgment in favor of the Columbia Casualty Company and the Red River Motor Company credit- ing them with the $540 paid plaintiff as compensation.

From this judgment, all defendants, except Gibson, appealed. Answering the appeals, plaintiff prays for an increase in the amount of the award in his favor to $21,373.20.

In logical order, the first issue to be considered and disposed of is that of joint adventure. On October 30th, some seven weeks after the accident, Mr. Val Irion, of counsel for the Columbia Casualty Company, visited plaintiff at his home for the purpose of delivering to him a check covering four weeks' advance compensation payments, and, further, to satisfy himself definitely if plaintiff was really entitled to receive compensation for his injuries. The facts of the accident and the trip to Benton with Gibson were discussed. Plaintiff made statements to Irion who reduced them to writing. The writing was then signed by plaintiff. It is said therein, alia, that,

"Several days before the accident, Mr. Gibson had told me he had prospects in Benton that he wanted me to help with. I promised to go and we made several attempts to get together on a time, but something would turn up to prevent one or the other from going. On the day of the accident, we met at the salesroom about 30 minutes before we left, and finding that I had some free time, Mr. Gibson asked me to go with him then. I agreed.

"We called on Mr. Julian Whittington, but he was out. We called on Mrs. R. L. Wyche and both of us talked to her at her home for about 30 minutes. We did not make a sale to her. I think we will."

And on the day after the accident, Gibson signed a written statement wherein the following appears:

"I was returning from Benton where I had been trying to sell Mrs. R. L. Wyche a car * * * I also went to see Mr. Whittington, but he was not there. He was also on my prospect list. * * * Mr. J. O. Prudhomme also a company salesman, was with me, helping me with prospects."

This statement was made to, written down by, and signed before an attorney of Mr. Irion's office.

Both plaintiff and Gibson repudiate the above-quoted portions of the statements signed by them. They positively deny and disclaim making the statements and deny that Prudhomme had anything to do with

interviewing Gibson's prospects and specially deny that he saw or talked with Mrs. Wyche at all. She corroborates them in this respect. They both say that plaintiff was simply invited by Gibson to make the trip with him to Benton, without reference to his position as a salesman. They testify that if a sale had been made by Gibson, plaintiff would not have received or been entitled to receive any commission thereon.

■ The quoted portions of these statements show Prudhomme to be entitled to receive workmen's compensation from his employer. If he made the trip purely for pleasure, as now contended, he was not entitled to compensation. We are constrained to believe that each made statements to their interviewers touching the matters mentioned. The facts thereof were peculiarly within the knowledge of plaintiff and Gibson. It may be that in writing the narrative, a construction was placed upon their words not intended by them. In such matters, there is ever present a danger of misconstruction or misinterpretation. If these statements were made by plaintiff and Gibson and are untrue, they have convicted themselves of fraudulently laying the foundation for Prudhomme to secure compensation not due him. He did receive compensation for 27 weeks, the conceded period of his disability. Be this as it may, ex parte statements of this character, regardless of the motive back of them, should not be given the weight and effect of sworn testimony, contrary thereto, in a court of justice; and especially should this be the rule where the testimony is otherwise corroborated in whole or part. No good reason is shown for Mrs. Wyche to testify falsely. She says that she did not talk to plaintiff at all the day of the accident; that he remained in the car while Gibson was at her home, a period of some thirty minutes. No other prospect was interviewed. We do not think the defense of joint adventure sustained by the evidence. Gibson was on a mission for his employer and was acting within the scope of his employment.

■ So far as concerns the facts of the collision, there is no material difference in the versions thereof by the eyewitnesses, the occupants of the two cars. Neither car reduced its speed as the intersection was neared. They collided while going at nearly the same speed. The left front part of the Kaiser car rammed the Gibson car about its left rear wheel. The former stopped instantly and turned over nearly in the center of the intersection, while the latter continued to travel southwesterly approximately 70 feet and capsized. There was no appreciable difference in the time between their entry of the intersection. Gibson was familiar with both roads and often passed over the intersection. He observed, but did not heed, the sign on No. 10, some 400 feet north of the intersection, which read, "Stop, Through Traffic." His action in this respect was in violation of rule 13 of section 3 and of subsection (e) of section 10 of title 4 of the State Highway Regulatory Act (No. 21 of 1932). The latter authorizes the highway department to designate main traveled or through highways by erecting at the entrance thereto from intersecting highways signs notifying drivers of vehicles to come to a stop before entering and crossing any such highway; and declares unlawful the failure to observe such signs. The former section is substantially the same. The failure of Gibson to observe the warning of this sign, but, on the contrary, to continue with unabated speed into the intersection, without regard to traffic conditions ahead of him, stamps him with gross negligence which was the or one of the proximate causes of the accident. If he had heeded the sign, the accident would not have occurred.

It is argued that under subdivision (a) of rule 11, section 3, of the highway act, Gibson had the right of way. This rule provides that when two vehicles approach or enter an intersection at approximately the same time, the driver approaching from the right shall have the right of way. This section of the statute must yield to the sections above mentioned. Unless this construction is given these rules, placing signs on less favored roads notifying the public of the proximity of through highways would serve little purpose.

■ Kaiser was not acquainted with the intersection nor with the physical conditions about it, but admits seeing the legend, "Cross Roads," east of it. That sign should have impressed him with the fact that not far ahead there was an intersection; and his vigilance should have been quickened thereby to meet any contingency that might arise. He admits he never reduced the speed of his car, but drove heedlessly into the intersection. Had he slowed down to any extent only for a moment, the

collision would have been avoided. It was negligence, in view of the facts, for him to have so acted; but he was guilty of negligence of a more serious character in not observing the Gibson car, in open view to his right side. Had he exercised that degree of caution and optical alertness expected and required of the prudent car operator, he would have seen the Gibson car quite a distance north of the intersection. This would have provided him with additional information that cross-roads were near him, and he would then have had ample time to bring his own car under control before entering the intersection. The superior privilege of right of way does not confer license to disregard fundamental rules instituted for the protection and safety of persons motoring on public highways. The privilege does not warrant the assumption on the part of its possessor that every other person is going to recognize such right under all circumstances. He is not justified, because of such superior right, to heedlessly and carelessly drive his car at a rapid·speed into and over road crossings and intersections, without due regard for the rights of those who may or may not be observing the traffic laws. A motorist is presumed to see that which he could have and ought to have seen.

"Motorist having right of way at intersection is not thereby relieved of duty of maintaining adequate lookout." Holderith et ux. v. Zilbermann et al. (La.App.) 151 So. 670; Murphy v. Star Checker Cab Company (La.App.) 150 So. 79; Pugh v. Henritzy (La.App.) 151 So. 668; Johnson v. Item Company, 10 La.App. 671, 121 So. 369; Hamilton v. Lee (La.App.) 144 So. 249.

We conclude that Kaiser's negligence in the respects mentioned concurred with that of Gibson in causing the accident, and that it was a proximate cause thereof. Comparatively, his negligence was not as great as that of Gibson, but, nevertheless, without it the collision would not have happened.

We do not think the defense of contributory negligence sustained by a preponderance of the testimony. Plaintiff was riding beside Gibson as his guest on the front seat of the car. Kaiser was approaching on the driver's side. Gibson looked to his left for traffic, but failed to recognize the Kaiser car. Having done so, it was but natural for Prudhomme not to concern himself as to the traffic conditions toward the east. He did look toward the west. Gibson's driving on the trip to and from Benton was not of such character as to call for extraordinary vigilance on the part of Prudhomme. He knew he was sober and was driving carefully. Plaintiff was not as familiar with the intersection as was Gibson and had no knowledge, he says, of the "Stop" sign on highway No. 10. Nothing had happened and there was no circumstance present to warrant plaintiff in making any suggestion or offering any counsel to Gibson as to how the car should be driven. The inevitable collision of the cars was known to the occupants thereof too late for any warning to be effective.

In cases of this kind, the rule expressed in Delaune v. Breaux, 174 La. 43, 139 So. 753, 755, finds fitting application:

"Delaune was the guest of Breaux. He was sitting in the car by the side of Breaux. If the guest of the driver of an automobile is under an equal degree of obligation with the driver to maintain a careful lookout for dangers ahead, then it is patent that there can be no recovery in the present case, for Delaune was in as good a position as was Breaux to see the danger in time to avert the accident, by calling Breaux's attention to its existence, granting that it might be anticipated, which is reasonable, that Breaux would drive his automobile more to the right in order to avoid, with greater certainty, a possible collision with the approaching automobile. However, while it is unquestionably true that a guest, as has often been held, must exercise reasonable care and diligence to protect himself by making it possible for the driver to avoid an accident, but it does not follow that he is constantly under obligation to look out for sudden or unexpected dangers that may arise ahead. He may rely reasonably on the driver to discharge that obligation."

Both sides have cited an abundance of decisions to support their respective contentions. No useful purpose would be served by cumbering this opinion with a review of them. After all, each case must be solved from its own peculiar facts.

Plaintiff was 30 years old when injured. He enjoyed good health and, so far as known, was in splendid physical kilter. His life expectancy when the case was tried was 31.6 years. From 1926, to the end of the 1933 season, he spent from 5 to 6 months each year playing professional baseball. During this period he received

salaries, ranging from $750 to $350 per month. He excelled as a pitcher, but we are convinced that his skill and ability as such had begun to decline before he was injured. Professional pitchers, with ·some exceptions, do not maintain the maximum of efficiency beyond the age of 30 years. Plaintiff admits he had been offered only $350 per month to pitch during the 1934 season, and accepted instead employment with the Red River Motor Company at $280 per month the year round. This amounted to more in dollars and cents than the salary to pitch ball for a short period. We do not think the effect of his injuries upon his pitching ability should have any material influence upon the quantum of damage due him.

In addition to being knocked semiunconscious and experiencing serious shock from the impact of the cars, the body of the fifth cervical vertebra of plaintiff's spinal column was badly crushed, a comminuted fracture. The laminae thereof were ruptured and the spinous process broken off and separated for one-half inch or more from the body of that vertebra. The vertebræ, from the fifth upward, were thrown out of alignment from those below this point, being displaced forward. Ligaments and tissues around and about this crushed vertebra were torn and injured. This displacement of the vertebræ and crushing of the fifth one produced pressure against the cord, resulting in paralysis of the left hand and arm. This gradually disappeared after treatment began and was not noticeable at the end of two weeks.

Immediately after being injured, plaintiff was carried to a sanitarium where he remained 30 days. Approved treatment required that he lie on his back upon a specially prepared bed with a leather halter on his head, with weights attached, to pull the displaced bones back to their normal position. This continued for about 30 days. The patient could only move his hands, feet, and legs. At the end of it "he was placed upon his back on a special type of apparatus and a plaster cast placed upon the body from the hips up and including the neck and head" (as described by Dr. Boyce). This cast was worn about 60 days. The injuries and treatment therefor caused plaintiff to suffer much pain and discomfort. Sores and boils developed from the long immobilization of so much of the body. For economic reasons, the treatment was inadequate, the ultimate result being that perfect realignment of the injured vertebra was not accomplished. However, the treatment given wrought such splendid results that Dr. Boyce declared same to be a "triumph for surgery." Plaintiff is handicapped materially because of the malalignment of his vertebræ, a condition permanent in its nature, for which there is no relief. Nature, in its efforts to restore normal conditions, threw out a substance about the injured bones which has calloused, producing ankylosis and rigidity of connections. This callous may encroach upon the canal and, should it do so, the pressure therefrom upon the cord would cause paralysis. At present, the ultimate result of the injury is that plaintiff is unable to flex his neck normally, nor can he lower his head more than 15 degrees. He has to look straight ahead. The greatest danger to his future physical welfare lies in the possibility of rupturing the connection of the fifth cervical vertebra by a fall, trauma, or other violent force applied to the body. The doctors agree that should this happen, the case would be hopeless. An automobile accident or a severe jolt or jar while riding in one could precipitate such a result.

There is no doubt that plaintiff is no longer a sound man physically. He will go through life thus handicapped, and is forced continually to observe the greatest care to protect the injured vertebra. However, he resumed work for his employer on April 1, 1935, six and one-half months after the accident, at a salary of $225 per month, as an automobile salesman. He ascribes the difference in salary to his disability. No one representing his employer gave evidence touching this question. The lower court awarded plaintiff $10,000 for suffering and disability, and $1,373.20, for physicians', . hospital, nurses', and other bills.

We perceive no good reason why this award should be altered. It is not manifestly excessive; neither is it manifestly inadequate. The learned trial judge's conclusion on this score is entitled to and should be given due weight. We affirm his judgment.