AYRES, Judge.
This is an action for damages for personal injuries sustained by plaintiff as the result of an automobile collision at the intersection of Linwood and Claiborne Avenues in the City of Shreveport, occurring about 12:10 o’clock A.M., October 20, 1955. Plaintiff was standing on the trolley platform or “safety zone” on the east side of Linwood, 79 feet north of the north curb line of Claiborne Avenue at its intersection with Linwood, waiting to board a northbound trolley to take her home from her day’s labor. Two motor vehicles, one driven by Douglas W. Robison and the other by Dr. Carroll V. Guice, collided in the aforesaid intersection. The Robison vehicle, after being struck by the Guice automobile, ricocheted, continued northeasterly, jumped the curb and struck plaintiff, amputating one of her legs at the scene of the accident and so injuring and damaging the other that, after several operations, it was removed.
*572 The defendants are Robison and his liability insurer, the Fidelity Mutual Insurance Company, whose liability was limited to $5,000, and Guice and his liability insurer, Allstate Insurance Company, whose liability was limited to $10,000. Trial was had before a jury, which rendered a verdict in plaintiff’s favor against the defendants, in solido, for $25,000, recognizing, however, the aforesaid limits of the insureds’ liability. Judgment was rendered and signed in accordance with the verdict.
Dr. Guice and Allstate Insurance Company, after unsuccessfully moving for a new trial, appealed to this court. Robison and his insurer did not appeal.
The appeal presents initially and primarily for resolution a question of fact, that is, whether or not Dr. Guice was negligent and, if so, if his negligence was a proximate contributing cause of the accident.
Linwood Avenue is a main four-lane thoroughfare in the City of Shreveport, 40 feet wide from curb to curb, and takes a general north and south course. Claiborne Avenue, only 30 feet wide from curb to curb, intersects and crosses Linwood at right angles. Traffic is controlled by electric semaphore lights. Linwood is a concrete paved street. Claiborne is asphalt surfaced.
While the night was dark, there were no unusual weather or atmospheric conditions that would obstruct one’s view or interfere with traffic. The weather was dry.
Robison was proceeding northward in his Oldsmobile on Linwood Avenue toward Claiborne Avenue and Guice was driving his Mercury east on Claiborne Avenue, approaching Linwood Avenue. It was the intention of both drivers to continue forward and through the intersection. The point of impact of the collision was four feet east and one foot south of the center of the intersection. The front of the Guice car struck the left rear of the Robison car. The Guice car skidded 28 feet before the impact. There was no evidence that the Robison car skidded prior to the collision but continued therefrom out of control until it struck plaintiff and knocked her against a concrete pole.
The evidence discloses that on the evening preceding the accident, Guice and one Sam Davenport had dinner at The Chef on East Kings Highway, after which they “whiled away” the time until about 11:30 in. the apartment of Miss Retha Maxwell, when they departed, driving westward through town to the Rex Drive-In, located on the Mansfield Road, where they picked up Miss Maxwell for the purpose of carrying her to her apartment, and it was while returning, proceeding eastward on Claiborne Avenue, that the accident occurred.
Joint and concurrent negligence was-charged against the drivers of both cars in failing to maintain a proper lookout, driving-at an excessive and unlawful rate of speed, failing to keep the vehicles under proper control or to yield the right of way to the-other car and to slow down or stop or to-give any warning signal of their approach.
Our first attention is now directed to the-negligence vel non of Dr. Guice. This can only be resolved by a consideration of the-evidence appertaining to the facts and circumstances of the accident and after applying those facts to the applicable principles-of law involved. As to the facts, we need consider none other than the testimony of Dr. Guice and that of his two companions, particularly that of Dr. Guice himself.
That Dr. Guice failed to maintain a. proper lookout and failed to exercise due precaution in an effort to prevent or avoid the accident is established by his own testimony. Inasmuch as this is a matter most earnestly questioned by appellants, we deem, it advisable to refer to and quote the Doctor’s testimony in considerable detail. The Doctor and his witnesses, his two companions, are apparently in accord that they were traveling 30 to 35 miles per hour as-they approached the intersection; that when from two or three car lengths to as much as- *573 100 feet before entering the intersection, the semaphore light was red; that the driver removed his foot from the accelerator in preparation to applying the brakes when the light changed to green, whereupon Dr. Guice accelerated his speed and proceeded into the intersection, not seeing the approach of the Robison car until the moment of the impact, although the physical facts would show that he was aware of some impending event or danger because he applied his brakes, which took effect, and his car began to skid four feet before entering the intersection and continued to the point of impact.
As to whether or not the Doctor was keeping and maintaining a proper lookout, he gave, under cross-examination, this testimony:
“Q. Now, during all this time, were you looking both to your right and to your left? A. (No answer)
“Q. If you don’t recall, say so. A. I was looking directly ahead, watching the intersection, yes, sir.
“Q. Looking directly ahead at that light, weren’t you ? A. Yes.
“Q. You had your whole attention, your visual sense was concentrated, on that light; is that not correct? A. I would say ‘Yes’, sir.”
Under direct examination, the defendant gave this testimony:
“Q. * * * You have testified that the light changed from red to green; did you do anything when it changed? A. When it changed, I proceeded on through the intersection.
“Q. All right. Now, can you tell us if you ever saw Mr. Robison’s automobile ? A. Just prior to the time that I—
“Q. Did you see his car prior, to the wreck? Yes or no? A. Yes. Yes, by sort of a glance in my vision.
“Q. . All right. How far do you think you were from the intersection when you saw the car? Or when you saw this impression or this glance that you speak of ? A. Well, it had to be at least a couple of car lengths.
“Q. Well, is that your testimony? That it was a couple of car lengths? A. Yes, sir; at least that.
“Q. At least that. Was it any greater than that? A. It’s possible, yes, sir; very possible.
“Q. Dr. Guice, what did you do, if anything, when you first observed that there was a car in the intersection, approaching from your right? A. Well, I just immediately reflexed to my brake.
“Q. You did what? A. Reflexed.
“Q. What do you mean by ‘re-flexed’? A. I hit my brake, because I knew that there zvas some impending danger there. I’m just saying that I automatically reflexed and hit my brake real hard.” (Emphasis supplied).
In a further discussion as to the distance he was from the intersection, which he again estimated at two car lengths, he testified:
“A. But that would have been just about the time that the light had changed, for me, directly to green, and I proceeded on into the intersection; and just in a split second, in my line of vision at that point, I noticed something from the right which caused me to suddenly reflex and hit my brakes.
“Q. In other words, it is now your testimony that at about the time the light changed for you is about the time that you saw the Robison car; is that right? A. No, it would have been just a moment after that.
“Q. A moment after that? A. Or a second.”
*574 The witness admitted that he gave testimony on October 21, 19S5, the day following the accident, wherein he stated:
“ ‘Q. You were involved in an accident on October the 20th, yesterday morning? A. Yes, sir, that’s right.
“‘Q. About 12:10 o’clock A.M.? A. Yes, sir. October the 20th, about 12:10 A.M., 1955, I was driving a light Mercury sport coupe, 1953 model, east on Claiborne Avenue and just before I reached the intersection the light came green to me.
“ ‘Q. That is the intersection of Claiborne and Linwood? A. Yes, sir. The light came green to me, and I had taken my foot off the brake, off, to put the brake on; but then I go ahead and shower down and go through the intersection, and by the time I get through the intersection, or in it, the only thing I saw was a red streak like that,’ ” (Emphasis supplied)
following which he was asked if that statement was correct, whereupon he testified as follows:
“A. Now — no, sir, I didn’t shower down on it, even though I may have said that the following day. That would have been like in the interrogation; when they go to ask you something you may make a remark using a slang expression, perhaps, or something like that.
“Q. What does ‘shower down’ mean to you, Doctor? A. Well, I just meant that I took my foot off the brake, accelerated—
“Q. Now, Doctor, ‘shower down’ doesn’t mean just accelerate to you, does it? Doesn’t that mean to come down hard? A. Well, we weren’t driving fast, to begin with.
“Q. I beg your pardon, sir? A. We weren’t driving fast, to begin with, so I had no—
“Q. I’m asking you to tell this Court and Jury what ‘shower dozvn’ means to you. A. Just the meaning of it, would mean to be a fast acceleration.
“Q. And you don’t deny that in giving this statement you said you ‘showered down’ to go ahead, do you? A. That’s in the statement.
“Q. That’s what you said? A. Yes.
“Q. Now, Dr. Guice, I’d like to know, once and for all, whether or not you saw the Robison car before you entered the intersection? A. Before I entered the intersection?
“Q. Yes, sir. A. It would have to be in my cone of vision. I noticed headlights in my cone of vision, which caused to go to my brakes.
“Q. Was that before, or after, you got into the intersection? A. It would be before I got to the intersection.
“Q. I again call your attention, Dr. Guice, to the statement given by you on October the 21st, 1955, before a Court Reporter, wherein you were asked the question — referring to the Robison car:
“ ‘Q. When you saw it, you were already in the intersection? Had you already entered the intersection? A. Yes, sir. I guess you would say I had entered the intersection, because it would be like this sidewalk here and this sidewalk here, and I was going this way about 30 miles an hour and I entered the intersection here, and by the time I spotted him speeding across in front of me, like this, the only thing I could do was flex like this, back like this, and my car had already traveled that 6 or 8 feet to the middle there.’
******
*575 “A. That all happened so suddenly that it seemed that just' — the point of entering the intersection, all of this happened so suddenly and1 the movement of my car would have to move several feet before I would absolutely be on the brakes. This happening so severely like that, I’m sure it would give the opinion that I was already right on top of him.
“Q. Dr. Guice, the truth of the matter is, that as you approached that intersection and saw the light change to green, you started on across and didn’t look either way, did you? A. I was cognizant of the entire intersection.
“Q. In other words, you figured you had the right of way and that anybody coming from the opposite direction would stop, so you went on across itf A. I would assume that.
“Q. I mean, that is what you decided in your own mind, isn’t it ? A. I—
“Q. That you had the right of way, the light had changed, so you went on across— A. I assumed that I had the right of way. I had a green light.
“Q. —not paying any attention to anyone coming from the right, left, or from the sky, did you? A. I would automatically be looking—
“Q. In other words, you decided you had the right of way, so you were going ahead; right? A. I was going to progress on through a green light.
“Q. Regardless of what anybody else was going to do; right? That anybody else coming would stop? A. Prior to the time that you speak of there, in my vision I could see the headlights from the right. I was already in the process of going into the — toward the intersection; and I saw, in my vision, coming from the right — I immediately hit my brakes—
“Q. In other words, though, up until the time that you were put what you call on actual notice that there was somebody coming in there, you were proceeding on the assumption that there wasn’t anybody going to come in there because you had the right of way? A. Right.
“Q. And so you weren’t paying any attention to what was going on. A. I couldn’t say that would be right, no sir; because I was still mindful of the intersection that I was going through.
“Q. Were any cars coming from the left? A. No, sir; not at that time.
“Q. Did you look? A. There was a wide open space in my cone of vision—
“Q. Did you look? A. ■ — would be there.
“Q. Did you look? A. I would automatically be looking.
“Q. I’m asking you if you looked? A. Definitely turned my head to the left to look?
“Q. Right. A. No, sir, I didn’t have to, because there was an open—
“Q. Did you turn your head to the right and look? A. No, sir; not directly right.
“Q. Did you slow up when you got to a point where you could see down to your right? A. I was slowing down prior to the change of the light, yes, sir. I was already in that process.
“Q. At the time the light changed, were you in a position where you could see down to your right? A. Yes.
“Q. Did you look? A. Just by watching the intersection, I could see the — as I can now, in a cone.
“Q. But you didn’t turn your head down and look to the right? A. No, sir." (Emphasis supplied.)
*576 After admitting that the beams of the headlights of the Robison car reflected a considerable distance, in answer to the question:
“Q. Well, now, when you saw the headlights of the oncoming Robison car, before you had reached a point two or three car lengths from Linwood, why didn’t you look — stop, look and listen before you proceeded into that intersection ?,
he stated:
“A. At that point? The light was completely in my favor”;
and admitted there was nothing to keep him from turning to the right or to the south on Linwood and avert the accident, which he said he could have done,
“A. If — I guess if I had been mindful far enough in advance to size up the situation completely—
“Q. Yes, sir, you could have”,
and he admitted that when he realized he was in difficulty he could not definitely state that he was SO feet back from the intersection but that he was approximately two car lengths or more.
Miss Maxwell contributed nothing of value in her testimony as to the occurrence, of the accident, as, according to her testimony, she was lighting a cigarette and did not see the Robison car until the impact. She made no observation of the traffic lights.
Davenport, according to his testimony, did not see the other car although he was riding on the righthand side of the front seat, the side from which the Robison car was approaching. He stated:
“A. My first conscious reaction to the accident was at the immediate point of impact. I am aware of looking out the front of the car, through the windshield, and seeing our car in contact with this other car. I say ‘in contact’, or the other car was immediately in front of us at the point of contact, or immediately thereafter. And the next thing that I can recall is flying through the air and hitting the concrete, or the pavement.”
His testimony followed closely that of Dr. Guice, from which it is established that neither Guice nor Davenport looked to the right or to the left before they reached or after they entered the intersection. The record is so replete with statements to that effect that it would not be but concluded that neither prior to nor after Guice entered the intersection did he turn his head either to the right or the left or make any observation as to the approach of traffic on the main thoroughfare. The driver’s own testimony is substantially to the effect that he was only looking for the green light and when the light so showed he accelerated or, as he stated, “showered down” and went on into the intersection without regard to any other fact or circumstance. As a result of his action, the collision occurred, Robison lost control of his car, struck plaintiff and inflicted the injuries, which caused indescribable suffering and the loss of both lower limbs of a woman 36 years of age.
Numerous decisions of the appellate courts of this State have recognized the principle of law that even when one has the right of way he is not relieved from the necessity of looking into the direction from which others may be expected to approach, and that where such care, as in the case here, would have prevented the accident, he who fails to look is guilty of negligence constituting a proximate cause of the accident, although the other party was grossly at fault. Johnson v. Item Co., Ltd., 10 La. App. 671, 121 So. 369. This principle was followed by this court in Thomas v. Leonard Truck Lines, Inc., La.App., 7 So.2d 753, 755, wherein it was stated:
“Because a person has the right-of-way on a road or street does not vest him with the privilege of going forward regardless of traffic conditions. A motorist’s duty to be careful never ceases. Surely he should not attempt *577 to cross a much traveled highway until and unless he positively knows it is safe to do so”.
This court has also stated in Prudhomme v. Continental Casualty Co., La.App., 169 So. 147, 152:
“The superior privilege of right of way does not confer license to disregard fundamental rules instituted for the protection and safety of persons motoring on public highways. The privilege does not warrant the assumption on the part of its possessor that every other person is going to recognize such right under all circumstances. He is not justified, because of such superior right, to heedlessly and carelessly drive his car at a rapid speed into and over road crossings and intersections, without due regard for the rights of those who may or may not be observing the traffic laws. A motorist is presumed to see that which he could have and ought to have seen.
“ 'Motorist having right of way at intersection is not thereby relieved of duty of maintaining adequate lookout.’ Holderith v. Zilbermann (La.App.) 151 So. 670; Murphy v. Star Checker Cab Co. (La.App.) 150 So. 79; Pugh v. Henritzy (La.App.) 151 So. 668; Johnson v. Item Co., 10 La.App. 671, 121 So. 369; Hamilton v. Lee (La. App.) 144 So. 249.”
The principle was again restated by this court in greater detail and with further explanation in New Hampshire Fire Ins. Co. v. Bush, La.App., 68 So.2d 254, 256, as follows:
“Appellants’ defense rests upon the generally accepted rule that where a motorist enters an intersection under the protection of being on a favored street or facing a favorable light, it is negligence to fail to notice another vehicle, moving in violation of the traffic right of way. In recognition of this principle our courts on several occas-sions have held that even the protection of a favorable light does not relieve the operator of a vehicle from all obligation, and that such a driver should see what any ordinary prudent person would see, and should act as an ordinary prudent person should act. (Citing numerous authorities.)
“The foregoing principle, however, has application only where it appears the circumstances are such that a person exercising only slight care would have noticed the other vehicle and where it appears also that had the other vehicle been noticed it would have been apparent to the operator of the favored vehicle that the operator of the other car either could not or would not stop. This is said to mean that a strict or an extraordinary obligation is not placed rtpon a favored operator but notwithstanding his position he may not blindly proceed into obvious danger which even one exercising slight care would have noticed and would have avoided.” (Citing authorities.)
Again, in Currie v. Government Employees Insurance Co., La.App., 90 So.2d 482, 485-486, this court had occasion to reaffirm the principles of law applicable to the facts of this case, wherein it was stated:
“The decisions of our courts are replete with pronouncements as to the duty of the motorist to be constantly observant. It is axiomatic that a driver should at all times be on the alert, steadily watching road conditions and keep his vehicle under such control as is commensurate with the circumstances, and the greater the hazard, the greater the degree of care which should be exercised. Rhea v. Daigle, La.App.1954, 72 So.2d 643; Potomac Insurance Co. v. City of Alexandria, La.App.1953, 66 So.2d 22; Hogue v. Akin Truck Line, La.App.1944, 16 So. 2d 366; Dyck v. Maddry, La.App.1955, 81 So.2d 165.
*578 “This court has on numerous occasions pointed out that traffic signal lights do not relieve a motorist of the general duty to operate his car with careful and prudent regard for the safety of others, and he cannot ordinarily assume that an intersection is clear simply because of the appearance of the green traffic signal lights. * * *
* * * * * >fc
“In Greenwood v. Romby, La.App. 1950, 51 So.2d 859, 861, the court made the further comment:
“ ‘While this and other Courts of the State have announced in several opinions that a green traffic light at or over a street intersection does not warrant a motorist to heedlessly drive into it, regardless of traffic conditions thereabout,. it has not been held, and we do not believe it will ever be held, that a motorist who approaches such an intersection is required to exercise the same degree.of care and vigilance, with respect to traffic, as he is required to exercise at an intersection not protected by a traffic light. The knowledge that intersectional traffic is regulated by a traffic light serves, to some extent, as assurance that the other fellow will observe same and not heedlessly undertake crossing the intersection unless the color of the light is such that he is thereby invited to do so.’
“Assuming the traffic signal lights were functioning properly, and such is a fact according to the evidence adduced, then, of course, one of the two motorists entered the intersection upon the green light. In view of the above ruling of the authorities we are of the opinion that neither Ruggiero nor Cur-rie would have been excused simply because the light was in his favor. While moving at a speed of less than twenty-five miles per hour as they approached the intersection, each was culpable in failing to observe the other. Had either noticed the other and maintained proper vigilance, it is difficult to see how the accident would have occurred. Both motorists were simply not looking and in this each was at fault.13 (Emphasis supplied.)
It was recognized in the case of New Hampshire Fire Ins. Co. v. Bush, supra, that the generally accepted rule, that where a motorist enters an intersection facing a favorable traffic light, it is negligence to fail to notice another vehicle moving in violation of the traffic right of way, has application only where it appears the circumstances are such that a person exercising only slight care would have noticed the other vehicle, and where it appears also had the vehicle been noticed it would have been apparent to the operator of the favored vehicle that the driver of the other car either could not or would not stop on the unfavorable traffic signal. It was said,, therefore, that a strict or an extraordinary obligation is not placed upon a favored operator but that, notwithstanding his favored position, he may not blindly proceed into obvious danger which one exercising slight care would have noticed and would have avoided. In accordance with that rule, we held in Sullivan v. Locke, La.App., 73 So.2d 616, 617, 621, that it is not placing a strict or an extraordinary obligation upon a motorist on a right of way street to exercise a mere slight care and precaution in observing approaching traffic, and that where the driver on the favored street did not look at all for approaching traffic, as Dr. Guice did not do here, but merely looked straight ahead and did not see that which was there for the motorist to see, the motorist did not exercise the slightest care in that regard. To the same effect is Thomas v. Roberts, La.App., 144 So. 70, and Kientz v. Charles Dennery, Inc., 209 La. 144, 24 So.2d 292.
Therefore, it is obvious that under a traffic light system the dangers at street intersections are less than if there were no *579 such signals, and the principle is recognized that where the danger decreases, less care is exacted, hut it has to be remembered that the traffic light system does not eliminate all dangers at intersections, and, therefore, that all care and precaution are not dispensed with. Even though Dr. Guice was proceeding into the intersection under a favorable traffic signal, it could only be concluded that his failure to look to the right at all for approaching traffic constituted negligence and establishes that he failed to exercise the slight care required of him. Having thus failed and proceeding into the intersection in the face of imminent and impending danger, the conclusion is inescapable that the Doctor was guilty of negligence constituting a proximate contributing cause of the accident.
If defendant was correct in his contention that his speed was only 30 to 35 miles per hour, such speed was not so great as to prevent him from taking effective means of either slowing, stopping or turning aside to prevent or avoid the accident, and had he made proper observation he should have realized the rapid approach of the Robison car and that it could not be stopped before reaching the intersection, for, had he even glanced to his right at a proper point before reaching the intersection, he surely would have been able to see a considerable distance south on Linwood Avenue. The approaching car was within the range of vision and it should have been at once apparent that the speed at which it was traveling was such that it could not be stopped prior to entering the intersection. Guice should, therefore, have refrained from driving into the path of the approaching car. His negligence is manifest.
That there was nothing to obstruct the view of Dr. Guice as he approached the intersection can hardly be denied. He stated that he had traversed this route many times and that his view had not been obstructed on the previous occasions. Police Officer Nunley, who made the investigation of the accident, stated that the hedge did not obstruct his view and that when 30 feet west of the intersection one could see south on Linwood a considerable distance. The defendant himself testified that at the time he could see 60 to 100 feet south on Linwood. To the same effect is the testimony of Mrs. J. C. Foster, who has lived at the southwest corner of this intersection for many years.
Plaintiff reurges the applicability of the doctrine of res ipsa loquitur and cites the cases of Dunaway v. Maroun, La.App., 178 So. 710; Chapman v. Travelers Indemnity Co., La.App., 45 So.2d 557, and Bonner v. Boudreaux, La.App., 8 So.2d 309, in support of her contention. In view of the conclusion reached herein as to the facts established in the record, it is not deemed necessary that we discuss the applicability of this doctrine, which is questioned by defendants.
Appellants alleged in a motion for a new trial that two jurors, Campbell and Willis, visited the scene of the accident during the course of the trial and that this constituted improper conduct on the part of these jurors. There is no suggestion, however, that there was any improper motive • actuating either of these jurors, neither is it shown that defendants have been prejudiced in their rights. There was only one dissenting vote to the verdict of the jury in this case, and one of the jurors visiting the scene of the accident is shown to have cast that dissenting vote. No instructions were given the panel that the members of the jury should not visit the scene of the accident. We are informed by the record that all the jurors in the case were residents of the City of Shreveport. It is, therefore, reasonable to presume that at least most of them had a general knowledge of this street intersection. There is no showing or allegation that the fact that these two jurors visited the scene of the accident had any effect or influence whatsoever on the verdict that was rendered.
In a written opinion overruling the motion, the trial judge, with reference to view *580 ing the scenes involved in a case of this character, said:
“We have done it and we do it frequently and out of the presence of counsel. Particularly in this kind of case, we visit the scene and get the impression in connection with the evidence which we have heard. And in many of our written opinions we have so stated and given the benefit, in writing, of our observations; and never yet has any appellate court said that that procedure was wrong. I don’t mean to say they have always agreed with our conclusions, but they have not said that our actions in that respect were in error. Of course, there is perhaps a difference between a judge, who is supposed to be able to properly evaluate as evidence what he sees at the scene, and a layman who is a juror, but at least the two situations are sufficiently similar to draw some analogy from. If it is not error for the judge to do that, I am not prepared to hold that it is error for a juror to do the same, where he is constituted the judge of the facts in the case and where, as in this case, there was no instruction to the jury not to do it.”
Should the jurors have committed error, we do not consider it, under the facts and circumstances of this case, prejudicial, as no improper motive was imputed to them and it is not alleged or shown that the rights of any of the parties were prejudiced by their action. Again, we say that if error were committed by the jurors, the appellants’ rights have not been prejudiced. The entire record is before us as an appellate court upon appeal, and upon this court is conferred full and complete authority to review the facts as well as the law and to reach a conclusion predicated entirely thereon, subject, of course, to review, on appropriate application, by the Supreme Court. The entire record has been reviewed by all the members of this court, as the record of our actions will show. Our conclusion is reached from our consideration and review of the record.
Before this court no issue has been made by counsel for either party as to the quantum of damages fixed by the verdict of the jury and the judgment in accordance therewith. We can only assume that this is chargeable to the low insurance coverage involved and the possible inability of the joint tort feasors to satisfy a more substantial award. We make mention of this point for the reason that we would not wish to have the amount of damages as fixed by the judgment in this case considered as any nature of precedent for in our opinion the almost indescribable injuries received by this plaintiff and the permanent effects thereof would justify a much greater allowance than that which has been fixed.
Accordingly, the judgment appealed is affirmed at appellants’ cost.
Affirmed.
GLADNEY, J., dissents, giving written reasons.