114 So.2d 98 (1959)
Kirby H. RANDALL et al.
v.
BATON ROUGE BUS CO., Inc., et al.
No. 4847.
Court of Appeal of Louisiana, First Circuit.
June 30, 1959.
Rehearing Denied August 31, 1959.
Certiorari Granted October 9, 1959.
*99 Taylor, Porter, Brooks, Fuller & Phillips, Frank W. Middleton, Dale, Richardson & Dale, Baton Rouge, for appellants.
Burton, Roberts & Ward, Baton Rouge, for appellees.
Before ELLIS, LOTTINGER and TATE, JJ.
ELLIS, Judge.
This suit arose from an accident which occurred on November 11, 1957, at the intersection of Winn Avenue and Goodwood Avenue in the City of Baton Rouge. There was a collision involving a bus owned and operated by the Baton Rouge Bus Co., Inc. and a Plymouth automobile owned by Duncan-Randall Tire & Supply Co., Inc., and driven by W. H. Randall. In this collision Randall as well as his two grandchildren were killed. The suit was brought by the parents of these grandchildren against Baton Rouge Bus Co., Inc., and The Travelers Insurance Co., liability insurer of the Randall automobile.
A trial upon the merits resulted in judgment in favor of the father of the minors in the amount of $15,000 for the death of each minor and the amount of $1,480.61, funeral and burial expenses, and in favor of the mother of the minors in the sum of $15,000 for damages for the death of each minor. The judgment was rendered against both defendants, in solido, but it was decreed the liability of The Travelers Insurance Co. should in no event exceed $50,000 in principal in accordance with its policy limits.
From this judgment both defendants have appealed, and the plaintiffs have answered the appeal asking an increase in the award for the death of the minors.
This case involves an intersectional collision. Goodwood Avenue, at the scene of the accident, runs generally in an easterly-westerly direction and is a two-lane black topped street. Winn Avenue runs in a general northerly-southerly direction and is also a two-lane black topped street, meeting Goodwood Avenue at a rather sharp angle from the northwest. On the north side of Goodwood Avenue and to the west of Winn Avenue is another two-lane black topped street, Sevenoaks Avenue. Goodwood Avenue is a through street and has the right of way over both the intersecting streets, and at the time of the accident traffic at the intersection was controlled by stop signs both on Winn Avenue and Sevenoaks Avenue. Prior to the collision, W. H. Randall was driving a Plymouth sedan in a southerly direction on Winn Avenue approaching Goodwood Avenue. At the same time, a bus owned and operated by the Baton Rouge Bus Co., Inc., was proceeding in a westerly direction on Goodwood Avenue, approaching its intersection with Winn Avenue. Randall, the driver of the Plymouth automobile, did not stop at the intersection but drove into Goodwood Avenue and his vehicle was struck on its left side by the front end of the bus. As a result of the accident two minor grandchildren of Randall, who were guest passengers in the Plymouth automobile, as well as Randall, were killed.
The parents of the two minor children brought this action and the District Court, with written reasons, held the accident was caused through the concurrent negligence on the part of both the driver of the automobile and the bus, and that this concurrent negligence was the proximate cause of the accident.
*100 The evidence clearly shows that Randall, the driver of the Plymouth automobile, was negligent. Two of the passengers on the bus which struck this automobile, as well as the bus driver, stated positively that the Plymouth car did not stop. Also, a disinterested witness, Davis Rankin, was standing about 150 feet north of the intersection and he watched the Plymouth car from the time it passed him until the collision occurred. He stated Randall did not slow up and that he definitely did not stop for the stop sign. This Plymouth automobile, aside from the failure of its driver to heed the stop sign, continued into Goodwood Avenue at a speed of 30 to 35 miles per hour, into the path of the bus. The evidence further shows this driver did not even slow down, and gave no indication of any kind that he was going to stop or slow his vehicle or even recognize the right of way of vehicles being driven along Goodwood Avenue. All parties concede his negligence, and the trial court found this negligence was a proximate cause of the accident. There is no need to quote authorities holding unanimous such failure to heed traffic signals, and the acts committed by Randall constitute negligence. The defendant The Travelers Insurance Co., liability insurer of the driver of the Plymouth automobile, offered no evidence in defense, and concedes its liability. Thus, we pass to a consideration of any negligence upon the part of the bus driver.
There are four questions to be decided by this court:
(1) Did the driver of the bus fail to keep a proper lookout and, if so, was such failure a proximate cause of the accident; and damages
(2) Was the bus being operated at an excessive speed?
(3) If, being operated at an excessive speed, was such speed a proximate cause of the accident;
(4) The question of quantum.
The law governing an intersectional collision has been settled by innumerable cases in our jurisprudence so that it is consistent, well defined and settled. All of the authority cited by counsel for the plaintiffs and the defendants lay down the same principles by which the facts developed on the trial of the case must be governed in arriving at a decision on the questions involved, supra. The facts varied but the law did not. In view of the fact that the negligence of Randall, the operator of the car in which the plaintiff's children were passengers, is admitted, in that he failed to stop or slacken his speed in total disregard of the stop sign located 48 feet from the intersection in front of him, we are only concerned with the law applicable to the duty of the driver on the favored street. The citation and quote from cases involving the duties of the driver on the favored street relied upon and cited by plaintiffs and defendants in their oral argument and brief will reveal the stability of the law and the accord amongst the appellate courts of the State of Louisiana as to the settled law governing the driver of a motor vehicle on a favored street.
In Miller v. Abshire, La.App., 68 So.2d 143, 147, cited and relied upon by the plaintiff, the Court of Appeal, First Circuit, stated:
"* * * The fact that a preference is created by statutes or by signals or stop signs on a highway does not relieve the person traveling on the favored highway from having his car under control and operating it at a reasonable and proper rate of speed while approaching an intersection and while crossing it. We quote the following from Blashfield, 2, Section 1030, page 310:
"`The general requirements with reference to speed and control in the operation of automobiles apply to drivers approaching or entering street or highway crossings or intersection; so that irrespective of statute, it is the duty of *101 such a driver in the exercise of ordinary care, on approaching or traversing a street crossing, to operate his car at a rate of speed which is lawful and reasonable under the circumstances and to have it under such control so that he may stop it so as to avoid abstractions or objects crossing his path. The question of what, within this rule, is an improper rate of speed and whether the motorist retained the requisite control of the car being one of fact.'" (Emphasis added.)
"`An automobilist, with knowledge of the location of a stop sign, has the right to rely, when crossing the intersection, on the assumption that any one approaching will observe it, and similarly a traveler on a boulevard or arterial highway has a right to expect an operator of a motor vehicle on an intersecting street to stop before entering thereon, and, with that exception in mind, the operator of the automobile on the favored street stops at the sign. If, however, the driver on the favored street sees, or in the exercise of due care should see, that the other vehicle neglected to make the stop required by law, he may himself be under the duty of stopping to avoid a collision at the crossing, at the risk of having his recovery defeated by reason of his being contributorily negligent.'"

In Martin v. Adams, La.App., 88 So.2d 476, 479, cited by plaintiffs, decided by our brethren of the second circuit, the court stated:
"* * * The superior privilege or right of way does not confer a license to disregard the fundamental rules instituted for the protection and safety of persons motoring on the highways, among which is the important rule of maintaining a proper lookout. Prudhomme v. Continental Casualty Co., La.App., 169 So. 147. When an intersectional collision occurs between two motor vehicles and the operators thereof charge each other with negligence, there can be no recovery by the party instituting an action for damages as a result thereof if that party, by the exercise of due diligence and reasonable care, could have avoided the accident. Kerschner v. Blache, La.App., 52 So.2d 749; Transcontinental Ins. Co. v. Toye Bros. Yellow Cab Co., La. App., 55 So.2d 585; Sullivan v. Locke [La.App., 73 So.2d 616], supra.
"In Kientz v. Charles Dennery, Inc., 209 La. 144, 24 So.2d 292, 294, it was stated:
"`It cannot and will not be disputed that a motorist, who recklessly and without exercising some degree of caution enters an intersection on a favorable light, is not free from negligence if he collides with another motorist who enters an intersection on an unfavorable light. And it cannot and will not be disputed that a motorist can not, in the face of imminent danger, rely upon the right of way accorded him by law.'"
In La Furia v. Tarver, 86 So.2d 232, 234, the Court of Appeal for the First Circuit stated:
"Thus both vehicles approached this unobstructed intersection almost simultaneously at moderate rates of speed, about 15-20 mph. Neither driver observed the other until immediately before the impact in the approximate center of the intersection. The front end of the Viccinelli vehicle struck the left side (front fender) of the Tarver car.
* * * * * *
"The writer of the opinion must frankly confess that in his individual judgment this case falls within the explicit provisions of LSA-R.S. 32:237, subd. A: `When two vehicles approach or enter an intersection at approximately the same time, the driver approaching from the right shall have *102 the right of way.' (Italics ours) See such cases as Gautreaux v. Southern Farm Bureau Casualty Co., La.App. 1 Cir., 83 So.2d 667; Duke v. Malone, La.App. 1 Cir., 57 So.2d 711; Gulf Ins. Co. v. Robins, La.App. 1 Cir., 15 So.2d 552; Pender v. Bonfanti, La. App. 1 Cir., 13 So.2d 105; Van Dyke v. Waguespack, La.App. 1 Cir., 198 So. 425; see also such cases recognizing the rule but denying recovery to the right of way motorists because of excessive speed as Sampey v. Martin, La.App., 80 So.2d 551; McClenaghan v. United States Fidelity & Guaranty Co., La.App., 79 So.2d 373; Prescott v. Rowland, La.App. 1 Cir., 32 So.2d 72.
"Legislative provisions for right of way are to facilitate the passage of traffic; rather than requiring all traffic to stop at each corner before proceeding, traffic with the right of way is generally entitled to continue towards and enter an intersection on the assumption that less favored traffic will respect said right of way, Gautreaux v. Southern Farm Bureau Casualty Co., La.App. 1 Cir., 83 So.2d 667; Van Dyke v. Waguespack, La.App. 1 Cir., 198 So. 425, unless the superior motorist sees or should see the inferior traffic and should reasonably realize its approach will continue and will obstruct the superior motorist's passage across the intersection in time to stop and avoid the accident, Miller v. Abshire, La.App. 1 Cir., 68 So.2d 143; Droddy v. Southern Bus Lines, Inc., La.App. 1 Cir., 26 So.2d 761; Termini v. Aetna Life Insurance Co., La.App. 1 Cir., 19 So.2d 286."
In the case of Kientz v. Charles Dennery, Inc., 209 La. 144, 24 So.2d 292, 294, cited by counsel for the Travelers Insurance Company, defendant insurer of the Randall automobile whose interest lies in an affirmance of the judgment of the lower court since the negligence of the operator of the Randall car could not be questioned. In the cited case the Supreme Court stated:
"It can not and will not be disputed that a motorist, who recklessly and without exercising some degree of caution enters an intersection on a favorable light, is not free from negligence if he collides with another motorist who enters an intersection on an unfavorable light. And it can not and will not be disputed that a motorist can not, in the face of imminent danger, rely upon the right of way accorded him by law. But it also can not be disputed that under the traffic light system a motorist, who is proceeding on a proper signal, should not be held to the same degree of care and vigilance as if no such system prevailed. He has the right to assume that the signals are understood and will be observed and he is not required to anticipate that pedestrians or other motorists will, in violation of law, enter a crossing on a wrong signal. The danger at such crossing is less than if there were no such signals and therefore less care is exacted. Clark v. De Beer, 188 So. 517, 520, decided by the Court of Appeal for the Second Circuit. In that case a motorist traveling on a green light, at a street intersection, struck a bicyclist who was running against a red light. The Court of Appeal, in its opinion, correctly observed: `She (the motorist) observed no one approaching, so she directed and continued her attention in front of her and proceeded forward. It was not encumbent on her to persist in looking from side to side as she progressed. Her legal duty, in view of the fact that she had the right of way, was to operate her car cautiously and carefully at a moderate speed, to be reasonably diligent in her driving and to maintain a general observation of the intersection.' * * *."
Again in Koob v. Cooperative Cab Company, 213 La. 903, 35 So.2d 849, 851, cited by counsel for defendant, Travelers Insurance *103 Company, the Supreme Court with Justice Hawthorne, stated:
"The law in this state is well settled that a motorist who is proceeding on a right-of-way street, upon approaching an intersection where traffic is required under a city ordinance, and is warned by stop signs, to come to a complete stop before entering the intersection, should not be held to the same degree of care and vigilance as if no ordinance existed or stop signs were erected. The danger at such an intersection is less than that at a corner where no stop signs have been erected, and therefore less care is required of the driver on a favored street. The motorist on the right-of-way street, with knowledge of the location of such a stop sign, has a right to assume that any driver approaching the intersection from the less favored street will observe the law and bring his car to a complete stop before entering the intersection, and such motorist can indulge in this assumption until he sees, or should see, that the other car has not observed, or is not going to observe, the law. See Termini v. Aetna Life Ins. Co., La.App., 19 So.2d 286; Kientz v. Charles Dennery, Inc., 209 La. 144, 24 So.2d 292; Glen Falls Ins. Co. v. Copeland, La.App., 28 So. 2d 145. See also Mayfield v. Crowdus, 38 N.M. 471, 35 P.2d 291; 2 Blashfield Cyclopedia of Automobile Law and Practice, Perm.Ed., sec. 1032, pp. 216, 217.
"Under this law, the boy on the motorbike in the instant case had the right to rely on the assumption that the cab driver would observe the stop sign, come to a complete stop, and look in both directions to determine whether it was safe to enter the intersection. There was no duty on the boy to reduce his speed before reaching the intersection merely because he was approaching it. Since the boy preempted the intersectionthis is shown by the fact that he was not going as fast as the cab, yet had gone more than half way across the intersection when the cab struck his bike on the right side, it was too late for him to do anything to avoid the accident after he realized, or should have realized, that the cab was not going to observe the stop sign. His failure to act to avoid the collision, therefore, could not in any way have contributed to the accident."
In the case of Federal Insurance Company v. Lepine, First Circuit, Court of Appeal, 55 So.2d 83, 87, cited herein by plaintiff this court stated:
"* * * Plaintiff relies strongly on the Droddy case wherein the court said: `An automobilist, with knowledge of the location of a stop sign, has the right to rely when crossing the intersection, on the assumption that anyone approaching will observe it, and similarly a traveler on a boulevard or arterial highway has a right to expect an operator of a motor vehicle on an intersecting street to stop before entering thereon, and, with that expectation in mind, the operator of the automobile on the favored street can proceed forward while the other traveler on the intersecting stops at the sign.' See also Smith v. Howard Crumley & Co., Inc., La.App., 171 So. 188; Glen Falls Insurance Company v. Copeland, La.App., 28 So.2d 145, and Anderson v. Louisiana Power & Light Company, La.App., 180 So. 243."
Another case cited by counsel for defendant Baton Rouge Bus Company is Gautreaux v. Southern Farm Bureau Casualty Company, La.App., 83 So.2d 667, 669, in which this court stated:
"To paraphrase the rule we have stated several times: A motorist crossing an intersection has the right to rely on the assumption that those approaching it will respect a stop sign which the motorist knows is located there, and accordingly he may proceed *104 If, however, in driving on the favored street he sees, or in the exercise of due care should see, that the other vehicle neglected to make the stop required by law, the motorist may himself be under a duty of stopping if by the exercise of reasonable care on his part the accident could have been avoided at the time he saw or should have seen the other vehicle violating its legal duty to stop before entering the favored thoroughfare. See Blashfield, Cyclopedia of Automobile Law and Practice, (Perm.Edition) Volume 2, Section 1032, pp. 333-344, cited in Miller v. Abshire, La.App. 1 Cir., 68 So.2d 143; Droddy v. Southern Bus Lines, Inc., La.App. 1 Cir., 26 So.2d 761; Termini v. Aetna Life Insurance Co., La.App. 1 Cir., 19 So.2d 286. See also Federal Insurance Co. v. Lepine, La.App. 1 Cir., 55 So.2d 83, where excessive speed on part of driver on main thoroughfare at blind intersection was held not to be proximate cause of accident.
"In the everyday world, ordinarily prudent motorists on the main thoroughfare do not slow before each corner and attempt to peer down the side streets, but instead concentrate most of their attention on the path ahead, relying on their legal `right of way'. Legislative provisions for right of way are to facilitate the passage of traffic in this congested twentieth century world. If to accomplish this purpose and in realization that even observing the path ahead may tax the ordinary motorists' powers of sustained observation, the legislature has relieved the motorist on the right of way street of a duty ordinarily to slow before each intersection (and, consequently, of a duty to take his attention from the path ahead by darting glances each way down the intersecting streets), appellate courts should not supply artificial standards in an unrealistic attempt to allocate damages after an accident has occurred."
Again in Nix v. State Farm Mutual Insurance Company, La.App., 94 So.2d 457, 459, cited by counsel for the Baton Rouge Bus Company, defendant herein, a rule of law with regard to the duty of a motorist on a favored street was reiterated as follows:
"We have had occasion several times recently to reiterate the rule that traffic with the right of way is entitled to approach towards and to enter an intersection, even if it observes traffic approaching on an inferior thoroughfare, because superior traffic is entitled to rely upon the assumption that the other traffic with respect the superior right of way, Brashears v. Tyson, La. App. 1 Cir., 86 So.2d 255; Bahry v. Folse, La.App. 1 Cir., 83 So.2d 912, certiorari denied Gautreaux v. Southern Farm Bureau Cas. Co., La.App. 1 Cir., 83 So.2d 667, unless the superior motorist should reasonably realize in time to stop and avoid the accident, that the inferior traffic will continue its approach and will obstruct the superior motorist's passage across the intersection, Miller v. Abshire, La.App. 1 Cir., 68 So.2d 143; Droddy v. Southern Bus Lines, Inc., La.App. 1 Cir., 26 So.2d 761; Termini v. Aetna Life Insurance Company, La.App. 1 Cir., 19 So.2d 286.
* * * * * *
"If the rule were that both parties are enjoined from entering an intersection so long as other traffic is in sight, and therefore ipso facto both parties are contributorily negligent in every intersectional collision, then of course Mrs. Nix had a duty to stop or to slow immediately upon perceiving the other vehicle. But the legislative provision of the right of way is to facilitate the passage of traffic, rather than requiring that all vehicles stop at each corner. Gautreaux v. Southern Farm Bureau Cas. Co., La.App. 1 Cir., 83 So.2d 667; Van Dyke v. Waguespack, La.App. 1 Cir., 198 So. 425. *105 The standard by which the actions of motorists are to be judged as negligent or not in legal actions is that of the reasonably prudent motorist, not that of the super-cautious motorist."
We have chosen only to cite some of the main cases relied upon by all parties to this litigation although, as previously stated, they are innumerable, and reiterate the same law as governing the rights and duties of the operator of a motor vehicle on a favored street.
The facts as testified to by the five eyewitnesses are not substantially in conflict on material facts, however, that of the two experts, one for the plaintiff and one for the defendant, as is not unusual are in hopeless conflict, but the decision of this case does not depend solely upon the testimony of the experts, but upon the testimony of the eyewitnesses and the physical facts and the application of the law governing the rights and obligations, accorded on the one hand, and imposed on the other by the law, to and upon a motorist on the favored street.
We come to the first question posed, viz., whether the operator of the bus was guilty of negligence in failing to keep the proper lookout. At approximately 8:20 the bus was being operated by its regular driver John B. Miller, on its regular route in a westerly direction on Goodwood Avenue, which is 19 feet in width across the black top or hard surface, and as he approached the intersection of Winn Avenue he saw the Randall automobile traveling in a southerly direction also approaching the intersection of that street and Goodwood Avenue. It is shown that Winn Avenue runs in a general north and south direction and is separated on the west from Seven Oaks Avenue by a neutral ground or park which runs from a narrow point nearest the intersection of Goodwood Avenue and gradually widens toward the north. Forty-eight feet from the north parallel line of the intersection of Winn and Goodwood is a stop sign for traffic approaching from the north and traveling south on Winn Avenue, to warn and direct such traffic to stop at the intersection of Winn and Goodwood Avenue, hence giving the superiority to Goodwood Avenue. The facts show that the Randall automobile was driven at the same speed it had been approaching in so far as the eyewitnesses could detect without stopping, slowing, swerving or the application of the brakes, straight into the intersection. The physical facts show that the left rear wheel left heavy skid marks at a distance of 29 feet east of the east parallel line of Winn Avenue across the intersection and 11 feet more within the actual intersection to the point of collision or a total distance of 40 feet of skid marks from the left rear wheel of the bus prior to the point of impact. The right rear wheel of the bus did not take effect or leave skid marks until it had just crossed this same east parallel line of the intersection along a continuation of Winn Avenue and left, therefore, 10 feet of skid marks before the point of impact. The bus operator, having begun to steer the bus toward the left in an effort to avoid the collision as testified to and shown by the skid marks, after the point of impact continued in a left curve so that the right rear wheel from the point of impact left skid marks of 28 feet to where it went off of the black top onto the shoulder and from there on the grass a distance of 24 additional feet, or a total of 52 feet from the point of impact. The left rear wheel of the bus left 38 feet of skid marks before leaving the black top and 14 feet thereafter to the point where it stopped, or a total of 52 feet, from the point of impact. Therefore, the right rear wheel of the bus actually skidded 92 feet, apparently, whereas the left real wheel of the bus actually skidded 62 feet.
Riding as a passenger on the bus was Mrs. Dickens who was sitting on the first cross seat in the front of the bus on the right-hand side next to the window. Also a Mrs. Anderson, a young married woman, who was sitting on the first cross seat on *106 the left-hand side to the rear of the operator. Their testimony is of great importance in arriving at a decision as to the location of the bus and the Randall car with respect to the intersection at the time the bus operator saw the Randall car and realized the eminent danger of a collision, that is, that the Randall car was going to disregard the stop sign and come straight on into the intersection in front of his bus. At the outset the writer wishes to state that "at the risk of being accused and truthfully so, of too much detail, that much of the testimony will be quoted so that there will be no question of what the record shows in view of the fact that he believes the judgment to be manifestly, obviously or clearly, all of which have been interpreted to mean the same by judicial decisions of Louisiana erroneous as to the Baton Rouge Bus Co."
Mrs. Ruby Dickens, who was sitting on the right, testified that she rode the bus every morning and afternoon to and from her employment and sat on the first cross seat on the right-hand side of the bus next to the window and looked out at the scenery as she always did on her daily trips on the bus. She was looking through the window to the right as the bus approached the intersection of Winn and Goodwood Avenue, and saw the Randall car approaching the intersection. She hesitated to give an estimate of the distance from the bus to the point of impact and that of the Randall car from the point of impact when she first saw the latter car, however, when asked if it was far away as "this room is long", referring to the court room which was estimated to be 40 to 45 feet long, she stated, "At least that far or perhaps a little farther. I would say that, yes." She also estimated that the Randall car was the same distance approximately from the point of impact as the bus at that time. After being allowed to read a statement which she made to the police on the day of the accident she was again asked whether it refreshed her memory any more as to the approximate distances the vehicles were when she first saw them, and she answered:
"Well, again I say I know very little aboutI mean I have no conception of feet or yards, like that, in distances, but in my memory that is most clear, I saw the car when it should have been slowing down for that stop sign there, and it wasn't, and that's what rested in my mind when I saw the car was coming right on out into the intersection without stopping. Well, I just froze, but that is most clear in my mind.
"Q. And you realized when you saw it that it was not stopping? A. I realized it wasn't stopping; it wasn't slowing down.
"Q. What did you do? A. I didn't do anything. I tried to say the car is not stopping, but I didn't say anything, I didn't do anything. I was just frozen.
"Q. Now the seat you were on was on which side of the bus? A. Right hand side of the bus.
"Q. And you were sitting on the front cross seat? A. Facing the front of the bus.
"Q. Can you give us any idea as to how fast the car was going? A. No.
"Q. Do you know how fast the bus was going? A. No, I don't know, not in miles, but he was going the usual speed. I would say well within the speed limit.
"Q. Do you drive, Mrs. Dickens? A. No, I don't."

Cross-Examination
"By Mr. Richardson: Q. Did I understand you to say, Mrs. Dickens, that when the Randall car, as we know it now was at the stop sign where it should have stopped you realized at that time that it was not going to stop *107 and was going to come on through? A. That's right.
"Q. That was before the bus's brakes were applied? A. Well, yes. As I say, I don't know, but I had the feelingwhy I have that I guess was when he applied the brakes perhaps the bus swerving or something made me realize that. I know he applied the brakes, but I know I had the thought at that time, and I still feel, that maybe he and I both saw the car and saw it wasn't going to stop at the same time.
* * * * *
"Q. Now, you said you started to say something to the bus driver about this situation? A. Well, Yes, that's the thought I had, that the car is not stopping and I was just shocked and frozen so until I never made a noise, never uttered a word.
"Q. In other words, you had an inner feeling that you wanted him to do something about it, is that correct? A. Something had to be done, and at the same time, well, he applied the brakes.
* * * * * *
"By Mr. Middleton: Q. No, just compare one to the other. Was the car as close to the place where the accident happened as the bus van was, or a little closer or a little further? A. Well, I would think maybe the busmaybe about the same distance, I would say.
"Q. Now, how long was it after you first saw this car, as you have described it, before you became aware that the brakes had been applied to the bus? A. About the same time.
"Q. As I understand it, at almost the same time you saw the car was the first time you felt the brakes go on? A. About the same time, because I had ajust from what I can remember now and then I thoughtyou know how when you see something is going to happen you will shout out or you will not say something, like that, and at the same time I had the thought when he applied his brakes he had seen it already himself, you know, and I had the feeling that maybe if I could shout or you think you want to warn someone that they had seen the same thing.
"Q. Now, I believe you say that you are unable to estimate in miles per hour the speed of the bus. Would you say it was about the normal speed for travel along Goodwood Avenue there? A. I would think it would be.
"Q. Do you have occasion to travel along there often? A. I ride the bus twice a day almost; average it twice a day all year around.
"Q. Well, was this bus this particular morning traveling any faster or slower than is normal along there? A. He wasn't going any faster than he usually goes along there.
* * * * * *
"Q. Is there any doubt in your mind that the brakes were applied at the same time or immediately after you became aware of the presence of the car? A. There is no doubt about that either.
* * * * * *
"Q. Mrs. Dickens, I think you have covered this in your other testimony but I would like to clear it up. Did you see this other car continuously from the time you first became aware of it up until the time the accident happened? A. I was looking at the car, yes.
"Q. What did it do during that time? A. It came right straight on out in front of us; it didn't pause, it didn't hesitate, it didn't give a swerve or anything. It came out directly right in front of us."
Therefore, from the above witness' testimony she saw the Randall car before it *108 got to the stop sign and "when it should have been slowing down for that stop sign there, and it wasn't," which was more than 48 feet from the intersection and more than 55 feet from the point of impact and her testimony is conclusive that the operator of the bus must have been looking at the car at the same moment and realized at the same time that it was not going to stop for the intersection and applied his brakes as quick as possible thereafter.
Mrs. Anderson, the other passenger on the bus who was sitting on the first cross seat on the left, facing the front was asked on direct examination "About how far was the bus from where you all came together when you first saw the car," and answered "I can't say definitely. I don't knowit wasn't a great distance, but it wasn't real close." When asked to give an estimate as compared to the length of the court room she stated: "To the best of my knowledge that I remember now I would say it was further than from here to the end of the room." This room was estimated to be approximately 40 to 45 feet long. When pressed to state the distance the car was from the point of impact when she first saw it, she answered, "It wasn't too terribly far from the intersection, because the thought just crossed my mind that he better start slowing down if he was going to stop at the stop sign, so it wasn't too far, but again I can't tell you how many feet because I don't know." She stated that she did not remember clearly whether the car was closer to the point of impact than the bus. She was again questioned as to when she first saw the car and was asked if the thought which crossed her mind that it ought to be stopping came to her attention when she first saw it. She answered:
"A. Uh-huh, that's whenI mean as I said earlier, I was looking out the window as you do when you are riding on a bus, and I saw the car approaching and, as I said, it crossed my mind that he ought to be stopping, and then I just turned and gazed out the other window, and that quick it had happened and it was over.
"Q. Do you know about how fast the car was going? A. No, sir, I don't.
"Q. How about the bus? A. Well, it seems to me that the bus was going pretty fast.
"Q. Do you have any idea of its speed? A. No, sir, I don't. * * *
Under the cross-examination by Mr. Richardson, counsel for Travelers Insurance Company, she was asked the following questions and gave the following answers:
"Q. And you saw this car was not going to stop when it was passing the stop sign from where you were sitting on the bus? A. He hadn't reached the stop sign yet.
"Q. He hadn't reached the stop sign when you first saw him? A. No.
"Q. He was even back of the stop sign? A. Yes, sir, and that's why I thought to myself that he ought to be stopping, because he was going pretty fast to approach a stop sign. Do you understand what I mean?
"Q. And every indication that car gave you was that it was not going to stop for the stop sign? A. Well, it didn't enter my mind that he wasn't going to stop. I mean, that is why I didn't bother to just keep looking at it. I just thought it was going to stop and I just dismissed it from my mind. It didn't dawn on me that he wasn't going to stop.
"Q. And this car, the Randall car, was closer in the intersection of the two streets there than the bus was at the time you saw it, was it not? A. You mean it was closer to the corner?
"Q. Closer to the center of the streets. A. No, sir, Well, I can't say exactly. I know he was. I don't *109 understand what you mean. Could you please repeat that?
"Q. Well which car, which was closest to the center of the intersection when you were looking at the car there, the bus or the Randall car? A. Oh, that's hard to say. I would imagine theI couldn't say actually, because I wouldn'd know whether we were closer or whether they were closer. We must have been pretty much the same distance.
* * * * * *
"Q. And do I also understand you to say that though you cannot say with certainty that your feeling that the bus was about as far back on Goodwood Avenue as the car was on Winn at the time you noticed the car, they were roughly or approximately the same distance back from the intersection itself? A. I would say so, yes.
"Q. And as I understand your testimony, it was your feeling at the time that he had better start stopping as he came up to the stop sign? A. Yes, sir.
* * * * * *
"Q. Well, was this feeling of being thrown to the floor immediately after you had first seen the car, or was there any time lapse in there while the vehicles were moving on a piece? A. I think it might have been a few seconds, if I am right, or maybe minutes. I don't remember, sir.
* * * * * *
"By Mr. Middleton: Q. But now after going over it and talking about it, and two or three of us asking you questions about it, I am asking you of your own present independent knowledge, was it not immediately after you first saw the car that you started to turn your head away and at that time were thrown to the floor of the bus? A. Yes, It must have been right in that space of time."
Mr. Richardson on cross-examination was reading some of the questions and answers which this witness gave at the coroner's inquest among which was the following:
"Question, `Miss Schneider, did you make any remarks to the driver when you first saw this car'? Answer, `No, but it was on the tip of my tongue. I have a terrible habit of back seat driving, and I am trying to cure myself of it, and that's why I didn't say anything, but I thought to say that, or yell or something, he's not going to stop or you had better stop, but I didn't say anything,' and that concluded your answer. Now do you recall making that statement? A. I think I did if it is written down there. It sounds a little silly now.
"Q. But you remember making the statement, don't you? A. I think so.
"Q. And that was your testimony at the coroner's inquest? A. Yes.
"Q. And that statement, would you say it is correct? A. Yes, sir.
"By Mr. Middleton: Q. This answer that was just read to you, that you didn't yell or say anything or do anything, that Mr. Richardson just read you, was followed by this question: `Why not'? and your answer was, "I don't know. I just never have been in a wreck like that.' Question, `Did it all happen that quick'? Answer, `Yes, it did, it happened just like that.' Question, `Before you had a chance to say anything'? Answer, `Yes, sir.' Do you remember testifying to that effect at the inquest, and would you say now that that correctly reflected what happened, the portion that I have just read? A. I guess so.
"Q. Well, I mean, is that the way you remember it now? A. I don't remember saying it like that because *110 that was three or four months ago, but I guess I said it if it was there.
"Q. Well, let me put it this way, so far as your present recollection is concerned, it is correct that you didn't say anything because you didn't have time to say anything, the throwing on the floor happened immediately after that? A. I guess so.
"Q. That is your present recollection? A. Yes, sir."
Therefore, this witness saw the Randall car before it got to the stop sign, which was 48 feet from the intersection, and at the time thought that the driver should slow down or begin to stop for the stop sign, and she also stated that it didn't enter her mind that it wasn't going to stop, and it would seem that she thought that it should and could stop. As to how long after she saw the car, if any, before the bus driver reacted or applied the brakes is not definite in her testimony. However, the preponderance of her testimony is to the effect that it was almost immediately thereafter.
John Miller, operator of the bus, at the time of the inquest gave a statement in which he estimated that the car when he first noticed it was a bus length from the intersection. He also gave a statement to the police that day in which he stated that "when I was about forty to fifty feet from the intersection I saw this car coming toward the intersection. I believe he was closer to the intersection than I was, but I can't say for sure." Upon the trial he testified that "I didn't measure it off in feet. It was probably a bus length or maybe two bus lengths from it." He was next told that the bus was approximately 30 feet in length and he again reiterated by answering, "I say from forty to sixty feet" was the distance of his bus from the point of impact when he first saw the Randall car.
The physical facts corroborate the testimony of the two lady passengers that they saw she car first before it got to the stop sign and realized almost immediately that it was not going to honor the sign and also corroborates the testimony of the operator of the bus that the car was 40 to 60 feet from the intersection when he first observed it. Also the testimony of the two passengers that the operator evidently saw and realized the danger at about the same time for the brakes went on almost immediately. Therefore we believe that it is well established by the preponderance of the testimony that the operator of the bus observed the car and realized the danger and took action when the car was approximately 60 feet more or less from the intersection. We say more or less because there is some testimony by the operator of the bus that he thought the car was somewhat closer to the intersection than the bus while the other two passengers estimated that they were about the same distance as they approached the intersection.
Therefore, in the case at bar, Miller, operator of the bus, being on the superior street with a stop sign located 48 feet from the intersection on Winn Avenue for motorists approaching this intersection along that avenue had the right to rely on the assumption that the Randall car would respect the stop sign and accordingly he had the right to proceed but exercising the ordinary and due care which the law imposed upon him, he saw that the Randall automobile prior to the time it got to the stop sign did not intend to honor the stop sign by stopping, and realizing the danger, exercised the obligation of reasonable care imposed upon him by immediately applying his brakes and swerving his bus to the left in an attempt to avoid the collision.
It is contended that as Miller, operator of the bus, could have seen the approaching Randall car at a distance of 122 feet when his bus was 90 feet from the intersection, as shown by the photographs introduced in evidence, that he was negligent in not observing it when the bus was 90 feet from the intersection and the Randall car was approximately the same distance. It was during this line of questioning that *111 our learned brother below, we think, misinterpreted the attitude of Miller when the latter was asked if he could not have seen the Randall car approaching at a distance 90 feet and answered, "You probably could have if you had been looking specifically for a car." Later on cross-examination by counsel for defendant Travelers Insurance Company, he stated that he could have seen the car if he had specifically looked but it would have been out of the ordinary. In other words, as we understand it, he did not feel it was any duty to look for cars 90 and 100 feet further from the intersection as he approached it and in this we believe he is within the law as he is only charged with the normal observation which would be to watch out for approaching traffic as he neared the intersection and as it neared the intersection.
We are convinced from the evidence and the physical facts that the operator of the bus kept a proper lookout and was in no wise negligent in this respect in that he fulfilled all the obligations and duties imposed on him as a motorist upon a superior street in regard to keeping a proper lookout.
The next two questions as to the speed of the bus and if excessive whether it was the proximate cause of the accident.
Without detailed discussion, we will state that we do not find manifestly erroneous the trial court's determination that the bus was proceeding at an excessive rate of speed immediately prior to the accident. While the testimony of one of the passengers that the bus was "flying low" is somewhat qualified by her statement that she thought all traffic in the Goodwood and Seven Oaks area went too fast, and while the bus driver himself thought he was proceeding at a speed of 25-30 mph (the testimony indicates that the bus was not equipped with a speedometer, nor were any busses used in the area due to mechanical difficulties in the use of bus speedometers), we agree with our brother of the trial court that the physical facts of the evidence indicate the excessive speed.
The bus company produced proof that its brakes were in good condition, and as the trial court stated, with brakes in good condition, "A bus traveling at the rate of 25 miles per hour or 30 miles per hour could not conceivably skid 92 feet and at the same time knock a car 104 feet in almost an opposite direction from which the car was traveling." We cannot say that it was error for the District Court to conclude an excessive speed, based upon these facts, the admission of the passenger that the bus was traveling fast, and the opinion of an expert (a professor of physics at LSU), who calculated the distance of the bus based upon the facts of the accident and the results of the collision as about 40-43 miles per hour.
However, after consideration of the facts of the accident, we have come to the conclusion that such excessive speed was not a proximate cause of this accident, because when the duty arose to observe that the car was not going to respect the bus' right of way (and also when such intention was actually observed), the accident could not have been avoided if the bus was going at the legal rate of 30 mph rather than its actual speed in excess thereof.
To recapitulate concerning the evidence: the car in which the little girls were riding was proceeding at a speed of 25-30 mph down Winn Avenue towards the main thoroughfare of Goodwood Avenue, when it passed the stopsign which was situated 48' from the north parallel line of Goodwood Avenue and continued to the point of impact without perceptible lessening of its speed. The point of impact was 7 feet south of the north line of Goodwood Avenue.
The speed of 25-30 mph is equivalent to a speed of 36.5 to 43.8 feet per second, which means that the accident happened 1½ seconds or less after the car passed the stopsign; earlier than which (at the speed of the car and location of the stopsign in question) the duty of the right of way driver would not arise to anticipate that the inferior *112 motorist could not stop before entering the main thoroughfare.
Nevertheless, the speed of the bus could contribute to the accident if because of its greatly excessive speed it was at such a distance at the time the inferior motorist approached the intersection as to mislead him into entering the intersection upon a reliance that he would not interfere with the passage of the approaching superior motorist at a legal speed; or if, but for the excessive speed, the superior motorist would have been able to stop and avoid the accident after the time he should reasonably have realized that the inferior motorist was going to invade the intersection in derogation of the former's right of way. The determination of this question depends upon the location of the bus at the time it became apparent that the car was going to proceed into the intersection in disregard of the bus' right of way.
We have already determined that the lookout of the bus driver was adequate and that, allowing for reaction time, he applied the brakes as soon as (or perhaps sooner) as he was under a duty to do so. The determination of the location of the bus at the time the brakes thereof were applied (and applied vigorously, according to the testimony of its driver) is relatively simple, for it is uncontested that the left skidmarks made by the bus brakes were 40 feet in length prior to the point of impact.
The investigating police officer testified positively that such brakemarks were made by the left rear wheel, because of the dual impression (the front wheels not being dual). Defendant's photographer, testifying from the photographs alone, felt that such marks she observed thereon were made by the left front wheel (which would have placed the bus further from the intersection at the time the brakes were applied, and might require a different holding than we have reached; namely, that contrary to our finding, the bus might have been able to stop after observing the car if it had been going at a legal speed). However, the positive and unshaken testimony of the veteran police officer, based upon his actual observations at the scene immediately after the accident, is, we feel, more reliable than the theoretical deductions of an expert drawn from photographs not necessarily reflecting the minutiae at the scene. We think, therefore, the evidence preponderantly establishes that the skidmarks 40 feet in length up to the point of impact were made by the left rear wheel. Since the bus was admittedly 30 feet in length, this means that the front of the bus was 10 feet away from the point of impact at the time the brakes were applied.
Where the bus was at the time the driver reasonably apprehended the danger and during which he was reacting to itthat is, during the reaction time, depends essentially on the speed of the bus at the time. Both the plaintiff's and the defendant's expert felt that the average reaction time of 3/4th of a second used by the stopping distance table at p. 23 "Driver's Guide" published by the State Department of Public Safety was the appropriate reaction interval to be used; which is corroborated to some extent by the testimony of the passengers that the bus driver apparently perceived and reacted to the danger in approximately the same time as they did.
While we recognize that stopping distances charts are based upon assumptions as to stopping surfaces, braking efficiencies, and reaction times which are to some extent variable, we think that the testimony in this case indicating a normal hard-topped stopping surface (see testimony of police officer and plaintiff's expert; testimony of defendant's expert that at times different than the time of the accident there was gravel on stopping surface, is not sufficient to outweigh same) and at least average braking efficiency on the part of the bus, together with the testimony of the experts indicating that the "Driver's Guide" stopping distance table could with some degree of reliability be applied to the present instance, justifies our use of same for purposes of determining the approximate location of the bus at the time the danger was reasonably perceived *113 and whether, at that time, the bus could have been stopped if proceeding at 30 mph.
We will set forth below three tables commonly used for purposes of illustrating of the stopping ability of motor vehicles:

 State's Blashfield's Lawyer's Motor
 "Driver's Automobile Vehicle Speed
Speed Guide." Law S.6236 Chart (1950)
At 30 33' 33' 44' Reaction Distance
mph (44' 46' 40' 76.2' Braking Distance
per second) 79' 73' 120.2' Total Stopping"
==============================================================================
At 40 mph 44' 44' 58.7' Reaction Distance
(59' per 82' 71' 147.8' Braking Distance
second) 126' 115' 205.5' Total Stopping"
==============================================================================
At 50 mph 55' 55' 60.3' Reaction Distance
(74' per 128' 111' 175' Braking Distance
second) 183' 166' 235.3' Total Stopping"
===============================================================================

At 45 mph, which we feel is the maximum speed indicated by the evidence, a vehicle travels 65.7' per second. Using the average reaction time of 3/4th of a second, this would mean that the front of the bus traveled approximately 49.2 feet during such normal reaction time after the danger was reasonably observed and appreciated and during which the brakes were being applied, until the brakes were finally applied, which was when the front of the bus was 10' away from the impact; or a total of about 60' prior to the impact. Thus, according to all the stopping tables above set forth, even if the bus had been proceeding at the legal speed of 30 mph at the time the danger was reasonably observed, the accident would nevertheless have occurred, even assuming a maximum speed of 45 mph on the part of the bus (and the evidence tends to indicate a lower speed).
In short, the use of such computations and the facts of the accident (including the circumstance that the car was hit immediately after crossing into the intersection) indicate that it became reasonably evident that the automobile was going to proceed into the intersection in disregard of the bus' superior right of way only when the bus was in such close proximity thereto that, even had it been proceeding at the legal and reasonable speed, an accident would have been unavoidable. The excessive speed of the bus, therefore, cannot be considered a proximate cause of this accident under the circumstances of this case. Bahry v. Folse, La.App., 83 So.2d 912, certiorari denied.
As to the quantum, the special damages are proven and conceded, being the funeral and burial expenses for the two children in the amount of $1,480.61. The two children, aged 7 and 3, were at the time the only children of the marriage; and their sudden loss caused incaluable shock and grief to their parents. The trial court award $15,000 for each child to each parent for their mental anguish and suffering, past and future, and their loss of companionship, love and affection, past and future. The award of damages in such instances is of necessity somewhat arbitrary and to some degree must be entrusted to the discretion of the trier of fact, although awards should be made so as to be comparable to those in similar instances, having due regard for the *114 differentiations in factual circumstances of necessity present in different circumstances.
Of course, no amount of money can compensate the parents for their tragic loss. But applying the above principles, we think that the awards for the mental anguish and loss of companionship of the parents, at the time of the accident and thereafter, should be reduced to $12,000 per child per parent, in order that the award herein be somewhat in accord with those made under similar circumstances. Watson v. McEacharn, La. App., 99 So.2d 138; Brooks v. State Farm Mutual Automobile Insurance Co., La.App., 91 So.2d 403; Himes v. Avinger, La.App., 85 So.2d 304.
For the above and foregoing reasons, the judgment of the District Court is reversed insofar as it held the Baton Rouge Bus Company, Inc., solidarily liable with the Travelers Insurance Company, and it is amended so to award judgment in favor of Hirly Randall against the Travelers Insurance Company in the amount of Twenty-five Thousand Four Hundred Eighty and 61/100 ($25,480.61) Dollars, and in favor of Mrs. Evelyn L. Randall against said defendant in the sum of Twenty-four Thousand and no/100 ($24,000.00) Dollars, together with legal interest upon said amounts from date of judicial demand until paid, and all costs of these proceedings.
Reversed in part; amended and affirmed in part.

On Applications for Rehearing.
PER CURIAM.
Both the plaintiffs-appellees and the defendant-appellant cast have applied for rehearing. The thrust of these applications is that in our original opinion we incorrectly released from liability the Baton Rouge Bus Company, Inc., one of the defendants-appellants.
It is called to our attention that we overlooked that the rear wheels of the bus were situated 8 feet from the rear end of the bus, so that the front of the bus was 18 feet away from the point of impact (rather than 10 feet as stated in our original opinion) when the brakes were actually applied so as to cause skidmarks. This circumstance does not alter our basic holding that "it became reasonably evident that the automobile was going to proceed into the intersection in disregard of the bus' superior right of way only when the bus was in such close proximity thereto to that, even had it been proceeding at the legal and reasonable speed, an accident would have been unavoidable."
The other suggestions of error advanced by the applications for rehearing are adequately answered by the reasons set forth in our original opinion.
Both applications for rehearing denied.