91 So.2d 403 (1956)
Ben A. BROOKS and Virgie Mae Brooks, Plaintiffs-Appellants,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, and James N. Stewart, Defendants-Appellees.
No. 8536.
Court of Appeal of Louisiana, Second Circuit.
November 29, 1956.
Rehearing Denied January 11, 1957.
Writ of Certiorari Denied February 25, 1957.
Hewett B. Johnson, Monroe, McKeithen, Mouser & McKinley, Columbia, for appellants.
Theus, Grisham, Davis & Leigh, Monroe, for appellees.
HARDY, Judge.
This suit was instituted by Ben A. Brooks and his wife, Virgie Mae Brooks, for the recovery of damages for the death of their six-year old son, Richard Allen Brooks, *404 resulting from an automobile accident. The defendants are James N. Stewart and his liability insurer, State Farm Mutual Automobile Insurance Company. The plaintiffs have brought this appeal from the judgment rejecting their demands after trial on the merits.
The facts, with few exceptions, are either undisputed or definitely established by the weight of the evidence. At or about 9:30 o'clock on the night of October 9, 1955, the plaintiff, Virgie Mae Brooks, was riding as a passenger in a 1949 Chrysler Fordor Sedan driven by her cousin, Mrs. Verna Lingofelter. The other passengers in the car were the three minor children of Mrs. Brooks; a three-year old daughter, who was seated on the front seat between Mrs. Brooks, who was on the right side, and the driver, Mrs. Lingofelter; an eight-year old daughter and her six-year old son, Richard Allen Brooks. The two older children were lying on the back seat of the car, covered with a quilt, and were asleep. The boy, Richard, was on the left of the rear seat with his head lying toward the left rear door of the automobile. The group of five people had been to Haughton, Louisiana, to visit the husband and father, Ben A. Brooks, who was there employed, and, at the time set forth, was returning to Monroe. The car was proceeding east on U. S. Highway No. 80 at a very moderate rate of speed, estimated to have been some 35 to 40 miles per hour. The night was dark, but cloudless; the pavement was dry, and, at the point of the accident, the highway was straight for a considerable distance in either direction and fairly level, there being only a slight grade to the east. At a point some two miles east of the Town of Choudrant, in Lincoln Parish, Louisiana, on an open, country road, the left rear door of the Lingofelter car flew open. The rear doors on this old model automobile were hinged at the back and opened from the front toward the rear. Mrs. Lingofelter almost immediately noticed the open door, and, looking to the back, realized that the little boy, Richard, had fallen out of the automobile, whereupon she immediately brought the car to a stop, partially on and partially off of the right paved lane of travel in which she had been driving. Mrs. Lingofelter hurriedly jumped out of the automobile, discovered that the car, because of the slight downgrade, was still in motion, called to Mrs. Brooks to stop the car, then slammed the left rear door shut, and started hurriedly back along the highway to the west where she had noticed the body of the little boy lying across the center line of the highway, some 200 feet distant.
At this point it is pertinent to observe that the little boy was clothed in blue jeans and a light-colored plaid shirt. The position in which he was lying on the roadway is accurately establishedthe head south of the center line, the shoulders on the line, and the legs projecting north of the line. The six-year old child, according to the testimony of the coroner who examined the body, was rather small for his age, and we can only approximate his height, from the testimony of his mother, as having been between two and one-half and three feet. That the body was clearly visible is established by the testimony of Mrs. Lingofelter, who saw the child lying in the road from a distance of approximately 200 feet without the aid of car lights, and by the mother, Mrs. Brooks, who testified that she saw the body of her child as it was picked up by the lights of the first passing car.
Mrs. Lingofelter had noted the approach of two automobiles from the east, and almost immediately after she had started back along the highway on foot, and while Mrs. Brooks was still seated on the righthand side of the front seat, one of these cars passed. Mrs. Brooks cried out: "Did that car hit him?" and Mrs. Lingofelter replied: "No, but stop that other car," or words to that effect. Mrs. Brooks then got out of the automobile and ran around the back of the car, shouting and waving her hands in the attempt to bring the second westbound automobile to a stop.
*405 The first of the passing automobiles was driven by Frederick Krembs Foster, who was a member of the United States Air Force stationed at Barksdale AFB, and the following car, a 1953 Nash Sedan, was driven by the defendant, James N. Stewart.
At the time of the trial Foster was on foreign service and, by stipulation, his written statement, given shortly after the accident, was admitted in evidence. According to the recitals of this statement Foster observed the Lingofelter car stopped in the south lane of the highway when he was some six or seven hundred feet east thereof and, as he passed the car, he observed a woman, who was obviously Mrs. Brooks, seated on the right side of the front seat, but he did not see Mrs. Lingofelter. Further, according to his statement, shortly after passing the Chrysler car Foster observed the body of little Richard Brooks lying across the center line of the highway at a distance which he estimated to be some 40 feet in front of his automobile. Foster's observation of the child was very clear for he testified that the head was to the south of the center line with the face turned toward him, and the legs were north of the center line projecting into his lane of travel. Although, according to his statement, the position of his car was only approximately two feet south of the edge of the paved slab to his right, Foster turned, not abruptly but simply by a swerving movement, still farther to his right and felt his right front wheel drop off of the pavement onto the shoulder of the highway before he actually passed the child's body, which he felt assured his car had not touched. Foster brought his car to a stop well on the right of the highway. Foster stated that shortly before the development of the above related incidents he had observed the Stewart car traveling some 50 feet to his rear, but he further stated that he did not note the position of the Stewart car after he passed the Lingofelter automobile.
The only other significant detail of Foster's statement was that, upon observing the Chrysler automobile stopped upon the highway, he removed his foot from the accelerator, which, however, because his car was in overdrive, did not have the effect of slowing his speed to any great extent. According to his testimony, after observing the body of the child, he swerved his car to the right and applied his brakes.
According to Stewart's testimony the Foster car had passed him some half mile or more to the east, and, from the point of this passing, he was following the course of the Foster car at a distance which he estimated to have been somewhere between five and nine car lengths, which would have approximated minimum and maximum limits of from 85 to 155 feet. This interval between the cars was somewhat lessened when Foster reduced his speed on passing the Lingofelter car by removing his foot from the accelerator and before Stewart reacted to this decrease in the speed of the preceding vehicle.
It is at this point that we approach a consideration of what we believe to be, possibly, the most significant factor in the entire chain of events. Unquestionably, the interval between the Foster and Stewart automobiles vitally affects the conclusion with respect to Stewart's negligence.
From Stewart's own testimony certain details clearly stand out. Stewart observed the Lingofelter car which he thought was standing wholly on the pavement of the south lane of the highway. Somewhere to the rear of the car he observed a signal being given, which he compared to the movement of the hand, up and down, in the nature of a signal given by a railroad man. Stewart observed every movement of the Foster car; the decrease in speed; the swerving to the right; the application of the brakes, and the consequent flashing of the stop lights, but he did not, at any time, see the child's body lying across the center line of the highway. Stewart testified that he saw only a glimpse of something white, about the size of his hand, just as he felt a bump of the left front wheel of his car, *406 after which he turned off the road and brought his car to a stop immediately behind the Foster automobile on the extreme north side of the highway. The bump obviously was caused by the wheel of the Stewart car passing over the body of the little boy, Richard Brooks.
From the testimony of other witnesses it was established that the Stewart car dragged or moved the little boy's body a distance of some six to ten feet west along the highway. The body was terribly mangled, despite which the child lived for some thirty minutes or so and was alive when placed in an ambulance which had been summoned to the scene. Death occurred en route to the hospital in Ruston.
One other detail in connection with Stewart's testimony is worthy of comment. Stewart testified that his examination of the scene disclosed tire marks of an automobile some 12 or 15 inches north of the child's body, which marks, he concluded, had been made by the Foster car as it swerved to the right. It must be noted that this testimony does not accord with the statement of Foster, who estimated he was traveling with his right wheels only two feet from the north edge of the pavement before he turned further to the right, after observing the body lying on the highway. It was established that the paved highway is 24 feet wide at the point of the accident. However, our appreciation of Stewart's testimony indicates that his observation was made at the point where the child's body finally came to rest after being struck by his car, and, therefore, we cannot attach any significance to this particular point.
Plaintiffs' petition made numerous charges of negligence as against Stewart, most of which we think have been clearly disproved, and, in fairness, have been abandoned by counsel for plaintiffs in argument and brief before this court. We need only mention that there was no excessive speed on the part of either of the vehicles, nor was there any negligence with reference to the distance interval at which Stewart was following the preceding Foster vehicle.
As we view this matter, the question of negligence on the part of Stewart must rest upon a resolution of two questions, which we state as follows:
1. Could and should Stewart, by proper observation and attention to the roadway, have observed the body of Richard Brooks, lying across the center line of the highway, in time to take effective action?
2. Could and should Stewart have observed, from the physical circumstances and conditions present at the scene, the necessity for the exercise of extraordinary care and caution?
Despite the suddenness of the development of this tragic occurrence, we are impressed with the fact that no element of speed nor lack of control of the vehicles is involved. Both westbound cars were traveling at a moderate speed, which we estimate must have been not more than 45 miles per hour; both were under the control of their respective drivers, and the interval separating the cars was more than sufficient to permit the avoidance of any collision due to the arising of a sudden emergency. We point out that both automobiles were brought gradually to a stop well over upon the side of the highway without the necessity for any sudden or abrupt action on the part of the drivers. As a result, we think it is conclusively established that there was a substantial interval between the cars as they approached the body of Richard Brooks. Though we cannot accurately estimate this distance, we think it would not have been any less, and was very probably more, than 50 feet.
According to Foster's statement he saw the body at a distance of only 40 feet, yet was able, without any abrupt action, to avoid striking the body with his car.
The question which follows is obvious. Why did not Stewart have the same opportunity to observe and to avoid striking the child's body? We think the answer to this question was given in the testimony *407 of the defendant, Stewart. Admittedly Stewart was making no observation of the roadway but had his entire attention focused upon the Foster automobile. Under the circumstances we must conclude that this failure to observe the roadway constituted negligence. In Rottman v. Beverly, 183 La. 947, 165 So. 153, 156, the court declared:
"The first duty of those who operate engines or motor vehicles is to keep a sharp lookout ahead to discover the presence of those who might be in danger."
This principle was reiterated by the Supreme Court in Jackson v. Cook, 189 La. 860, 181 So. 195, 197. The opinion referred to
"* * * the well-recognized and settled rule that the duty of those in charge of motor cars and engines to look ahead and observe never ceases; that what they can see they must see and in legal contemplation they do see; that their failure to see what they could have seen by the exercise of due diligence does not absolve them from liability."
And again in Scheib v. Ledet, La.App., 57 So.2d 814, 816, our brethren of the Orleans Court observed:
"It is a presumption of law, juris et de jure, that a person saw a thing that he should have seen had he looked, and that his failure to see what was there to be seen constitutes negligence."
In Rector v. Allied Van Lines, La.App., 198 So. 516, this court, in an opinion of Mr. Justice Hamiter, who was then a member, made a significant comparison of the conduct of two drivers, one of whom, by proper observation, was able to avoid a collision, while the other, inattentive to his duty of watching the road, was found negligent in colliding with another vehicle.
We think the tendency of our jurisprudence shows an increasing emphasis on the duty of a motorist to watch and observe all that is within his field of vision along or in close proximity to the roads and highways upon which he travels. In the case before us, we think there was no necessity for Stewart to have so concentrated his attention upon the movement of the Foster automobile as to entirely shut out his observation of any dangers which might be present on the highway itself, particularly in view of the warnings he had received. If Foster saw the child's body at a distance of 40 feet, the same observation could, and should, have been made by Stewart, who had at least this much distance, and, very probably, considerably more, between his automobile and the preceding car.
We concede the legal principle urged by learned counsel for defendant that a motorist has the right to assume that a highway is safe for travel and free of obstructions. Blashfield's Cyclopedia of Automobile Law and Practice, Volume 5-A, Section 3320, pp. 387-391; Jacobs v. Jacobs, 141 La. 272, 74 So. 992, L.R.A.1917F, 253; Kirk v. United Gas Public Service Co., 185 La. 580, 170 So. 1; Reeves v. State of Louisiana, 80 So.2d 206; Snodgrass v. Centanni, 229 La. 915, 87 So.2d 127.
It must be observed that the general rule, as enunciated in the authorities above cited, and numerous other cases, is subject to certain qualifications and limitations. For example, in the Jacobs case the court specifically referred to a dangerous situation which suddenly appeared immediately in front of the defendant's automobile. In the Snodgrass case the court limited the application to instances where there was nothing to put the drivers on guard. In the Reeves case this court particularly emphasized the fact that a driver is not required to anticipate extraordinary obstructions to which his attention has not been turned.
*408 In our consideration of the instant case we disregard all authorities bearing upon sudden emergencies for we think it is conclusively established that there was no emergency in the usual connotation of a sudden development. On the contrary, the development of the danger, as we shall hereafter attempt to demonstrate more in detail, involved a normally developing sequence of events.
The legal principle that a motorist is held to see what could and should be seen is so firmly established in our jurisprudence and so clearly defined, accepted and recognized as to obviate the necessity of further comment. This is the direct issue that must be here decided, and we conclude that the defendant, Stewart, by proper attention to the roadway could and should have seen the body of Richard Brooks in time to have avoided striking it with his car. We think this conclusion would be justified if all the surrounding circumstances, except the presence of the body and the approaching movement of the Foster and Stewart cars, were eliminated. When, however, the attendant circumstances are taken into consideration, the foundation for the conclusion is strengthened beyond the possibility of successful contradiction.
Let us look at these circumstances to which we refer. First, Stewart was confronted, as Foster had been confronted, with the clear view of the Chrysler automobile, with headlights burning, stopped, at least partly, upon the paved highway; Stewart was warned, as Foster had not been, with the emergency danger signal given by Mrs. Brooks from a position somewhere to the rear of the parked automobile and some 200 feet from the body of Richard Brooks. Why Stewart did not see the figure of Mrs. Lingofelter in the highway, we cannot explain. But, finally, Stewart had the opportunity to, and did, observe the successive precautions taken by Foster, which were, first, the slowing down by deceleration at or near the position of the Chrysler automobile; second, the swerve to the right, accompanied by the application of brakes and the flashing of the rear signal lights. As we have pointed out, the time and speed elements are not factors under these established facts. Stewart was driving at a moderate rate of speed, with his car under proper control, at a safe distance behind the preceding automobile. He was guilty, first, of failure to make any observation of the surface of the highway upon which he was traveling; second, in dismissing, as of no consequence or circumstance, the signals and warnings, above related, which clearly indicated the immediate need for extraordinary care and for the exercise of a heightened power of observation.
It is contended by counsel for defendant that plaintiffs have failed to establish the death of Richard Brooks as having been caused by the Stewart automobile. The purpose of this argument is, of course, designed to suggest that injuries sustained in the fall from the car might have resulted in death, independently of the injuries caused by the Stewart automobile. Under the facts which have been established we feel constrained to reject this contention. The only medical testimony in the record was given by Dr. J. J. Bennett, Coroner of Lincoln Parish, who was called to the Ruston Hospital immediately following the arrival of the ambulance with the body of Richard Brooks, who was dead or arrival. We quote the pertinent portions of Dr. Bennett's testimony with reference to the result of his examination of the body:
"Well, the child was in the Emergency Room in there at the Charity Hospital on the table and I went over it carefully and he was, I think they said he was six years old, but be looked a little bithe wasn't very well developed forhe wasn't grown, he was evidently small boy and the first thing I noticed was a big cut across beginning at his left ear and went to the *409 top of his head and it cut the bone and all, it looked like a straight cut to the top of his head into the brain substance. The brain was pouring out through this wound and the next thing that I noticed was that his left shoulder and collar bone was broken in. His entire left side was crushed flat and I thought I could detect the imprints of an automobile tire across here.
"Q. Across hisA. Chest, his left chest across his body and went off about the right hip and further down his right leg was torn and broken in several places and almost torn off and other than that I didn't seethe back of his body and the back of his head was not, there wasn't any sign of an injury on that part.
* * * * * *
"Q. And you say as the cause of death you assigned what reason? A. Well, the wounds that I saw looked like it was caused by an automobile, being struck and ran over by a car of some kind.
* * * * * *
"Q. Now, Dr. Bennett, based upon a hypothetical set of facts, presuming that you have a six year old child riding in the rear seat of an automobile and that child falls out accidently from the rear seat of the car and lands on a blacktop highway and subsequent to his landing he is not run over by the car in which he was riding, a short time thereafter a car traveling at a rate of speed along the highway at approximately forty-five miles an hour strikes the child, which of the two things do you feel, in your opinion, most likely to produce death? A. I'd rather not answer that, because I really don't know and I don't want to harm anyone.
"The Court: Of course, doctor, if you know and you have an opinion, you would be required to express that as an expert or if you don't have an opinion, then, of course * * *
"The Witness: Well, I'd rather just say I didn't have an opinion and skip that.
"By Mr. Johnson: Q. Do you know of any, from your personal knowledge have you had occasion to, do you have any personal knowledge of a small child falling from an automobile? A. Yes, I've seen one or two that had fallen from automobiles.
"Q. Were those falls fatal? A. No. One of them wasn'twell, I've seen, especially for a child, one fell out of a car and just skidded on the pavement and it kinda roughed him up like you would go over him with sandpaper or something like that, very painful, but didn't kill the child, he skidded a piece on the pavement, hit on his back and buttock and wasn't fatally hurt.
"Q. Have you known any cases of any children falling from cars being fatal? A. No.
"Q. And you've been practicing medicine how long? A. Oh, fifty years.
* * * * * *
"Q. Dr. Bennett, would either the crushed chest or the fractured skull or the fracture of the leg have been sufficient to produce death in this child? A. I think either one of the injuries would have been fatal."
The reluctance of the witness to express an opinion as to the exact cause of death does him credit, but it cannot be urged that this forebearance justifies the conclusion that the child would have died as the result of injuries sustained by falling from the automobile in which he was riding. This would be purest speculation. There can be no question as to the fact that the child was run over by the left *410 front wheel of the Stewart automobile and was dragged or carried by the momentum of the blow for some six to ten feet along the pavement. In the light of human reason and experience it must be concluded that the injuries received in this manner were responsible for the condition of the body as described by Dr. Bennett.
The burden of proof does not require the fulfillment of an impossible condition. Under the circumstances it would have been clearly impossible for plaintiffs to establish the nature and degree of injuries which might have been received by their son in the fall from the automobile. However, it has been established that the injuries which were inflicted when the child was struck and run over by the Stewart automobile were sufficient, separately or together, to cause death. It must be concluded that these injuries did cause death.
There remains only the determination of the quantum of damages. As we have many times observed, there is no rule, in cases of this nature, which serves as a guide. There are only a few well established and recognized principles of human relationships which are subject to consideration. The impossibility of making any sort of adequate compensation in terms of money for the loss of the invaluable intangibles of love and affection is beyond question.
In the recent case of Himes v. Avinger, La.App., 85 So.2d 304, this court approved a jury award of $10,000 to each of the surviving parents of a fifteen year old boy. In the instant case the proof on this point is not nearly as extensive and convincing as that which was adduced in the case cited. However, the young parents in this case have lost their only son, apparently a bright, healthy, normal, affectionate child, loving and loved. Very likely whatever award we make will prove unsatisfactory to both parties. However, we feel that an allowance of $7,500 to each of the surviving parents would at least, in some degree, represent an acceptable figure. To the award in favor of the plaintiff father there must be added the expenses incurred, in the sum of $585.
For the reasons assigned the judgment appealed from is annulled, avoided and reversed and it is now ordered, adjudged and decreed that there be judgment in favor of plaintiff, Virgie Mae Brooks, and against the defendants, State Farm Mutual Automobile Insurance Company and J. N. Stewart, in solido, in the sum of $7,500; that there be further judgment in favor of the plaintiff, Ben A. Brooks, and against State Farm Mutual Automobile Insurance Company and James N. Stewart, in solido, in the sum of $8,085.
It is further ordered that the amounts awarded bear interest at the legal rate from the date of judicial demand until paid. All costs of both courts are taxed against defendants-appellees.
GLADNEY, Judge (dissenting).
I respectfully dissent from the majority opinion, as it is my conviction negligence on the part of Stewart is not indicated.
The opinion holds Stewart negligent in two respects: (1) "Of failure to make any observation of the surface of the highway upon which he was traveling"; and (2) "In dismissing, as of no consequence or circumstance, the signals and warnings * * * which clearly indicated the immediate need for extraordinary care and for the exercise of a heightened power of observation." (Emphasis supplied.)
The opinion recognized that Stewart at all times was driving at a reasonable rate of speed and had his motor vehicle under proper control. As to Stewart's lookout and observation, the opinion states: "Admittedly Stewart was making no observation of the roadway but had his entire attention focused upon the Foster automobile." *411 With the exception of seeing the boy's body it is clearly shown Stewart saw everything in the road ahead he could see; therefore, the conclusion he was making no observation of the roadway is a non sequitur.
The evidence abundantly and convincingly proves Stewart was alert and observant of the road. Therefore, this case is not one where the motorist is at fault in not looking. Stewart was looking but he did not see the boy's body on the highway. This was because it was not discoverable by Stewart's eyes, and he was a man of normal vision.
Proof to legal certainty in a negligent case is not satisfied simply by presenting evidence of the failure of a motorist to exercise extraordinary care and a "heightened power of observation." Actionable negligence is not measured by extraordinary attainments in the exercise of care upon the highway, but, or rather a motorist is bound to exercise care against what usually happens or what is likely to happen. Thus, in Moore v. Jefferson Distilling & Denaturing Co., 1930, 169 La. 1156, 126 So. 691, 695, our Supreme Court quoted from Stone v. Boston & Albany R. Co., 171 Mass. 536, 51 N.E. 1, 41 L. R.A. 794, as follows:
"`"The question is not whether it was a possible consequence, but whether it was probable, that is, likely to occur, according to the usual experience of mankind. That this is the true test of responsibility applicable to a case like this has been held in very many cases, according to which a wrongdoer is not responsible for a consequence which is merely possible * * * but only for a consequence which is probable, according to ordinary and usual experience. One is bound to * * * provide against what usually happens and what is likely to happen; but it would impose too heavy a responsibility to hold him bound in like manner to guard against what is unusual and unlikely to happen, or what, as it is sometimes said, is only remotely and slightly probable. A high degree of caution might, and perhaps would, guard against injurious consequences which are merely possible; but it is not negligence, in a legal sense, to omit to do so. * * *"'"
Judge Taliaferro as the organ of this court in Wilson, Zurich General Accident & Liability Ins. Co., Intervenors v. National Casualty Company, La.App.1939, 191 So. 574, 579, approved the following quotation from Lane v. City of Buffalo, 232 App.Div. 334, 250 N.Y.S. 579, 580:
"`Test of actionable "negligence" is not what could have been done to have prevented accident, but what reasonably prudent and careful person would have done under the circumstances. In this connection, failure to guard against a remote possibility of accident, or one which could not, in the exercise of ordinary care, be foreseen, does not constitute "negligence."'"
The majority opinion holds that Stewart was negligent in that he should have seen that which he could have seen. In my opinion Stewart did not see the boy's body because it was not discernible within his range of vision, even with an alert exercise of observation. The judgment of the trial court is correct and should be affirmed.
Rehearing denied; GLADNEY, J., dissenting.