137 So.2d 415 (1962)
Sam LITTLE, Individually and on Behalf of his Minor Children, Johnny and Judy Little et al., Plaintiffs and Appellees,
v.
SAFEGUARD INSURANCE COMPANY et al., Defendants and Appellants.
No. 474.
Court of Appeal of Louisiana, Third Circuit.
January 29, 1962.
Rehearing Denied February 21, 1962.
Certiorari Denied March 28, 1962.
*416 Hall, Raggio & Farrar, by R. W. Farrar, Jr., Lake Charles, for defendants-appellants.
Nathan A. Cormie and Fred R. Godwin, by Nathan A. Cormie, Lake Charles, for plaintiffs-appellees.
Before TATE, SAVOY and CULPEPPER, JJ.
CULPEPPER, Judge.
On December 31, 1958, Ray Karl Johnson was killed in an automobile accident, when the vehicle he was driving alone collided with a 1955 Chevrolet, driven by Sam Little and occupied by the minor passengers, Johnny Little, Judy Ann Little, Frances Gail Welch and Sandra Welch. Sandra Welch was killed instantly and the other occupants of the latter car received injuries of varying severity. At the time of this accident, Johnson was returning to Houston, Texas, from Miami, Florida in a 1958 Ford Tudor Sedan, which was owned by Mrs. Billy Gene Formby of Houston, Texas, and insured by Safeguard Insurance Company. (Although Mrs. Formby's subsequent married name was Barclay, she will be referred to hereinafter by her former name only.)
Before his death, Johnson was engaged, with one Fred Baum, in the business of placing, maintaining and servicing vending machines for cigarettes, gum, etc. This operation was domiciled in Houston, Texas, but was also carried on in numerous other southern Texas cities. These vending machine locations were organized into routes which were traveled periodically. For use in this business, a 1958 Ford Courier panel truck was purchased and insured in the names of both Fred Baum and Ray K. Johnson by the Camden Fire Insurance Association, which policy was in effect on the date of the subject accident. On about December 8, 1958, this Ford Courier panel truck had been involved in an accident while being driven by Irving Camp, an employee of the vending machine business, and it was placed in a garage for repairs on December 11, 1958, where it was still located when the subject accident occurred.
Suit was filed against both Safeguard Insurance Company and the Camden Fire Insurance Association by Sam Little, individually, and on behalf of his minor children, Johnny and Judy Ann, by James G. Welch on behalf of his minor daughter, Frances Gail Welch, and by Benny B. Welch for the death of his minor daughter, Sandra Welch.
Plaintiffs alleged that the policy of liability insurance issued by the Camden Fire Insurance Association to cover the 1958 Ford Courier panel truck, in the names of *417 Fred Baum and Ray K. Johnson, extended to and provided coverage on the 1958 Ford Tudor Sedan, being driven by Johnson at the time of the subject accident, by virtue of a provision in the Camden policy providing for such coverage in favor of a "temporary substitute automobile." Defendants denied that the said 1958 Ford Tudor Sedan met the characteristics of a "temporary substitute automobile" but the jury found in favor of the plaintiffs on this issue.
Damages were assessed by the jury, and judgment rendered against the defendants, Safeguard Insurance Company, and the Camden Fire Insurance Association, in favor of the plaintiffs in the following total amounts:
a) For Sam Little individually, for his personal injuries, $27,500, and for his property damage, $1,000
b) For Sam Little for bodily injury and for expenses incurred on behalf of Johnny Little the sum of $6,800
c) For Sam Little for bodily injury and expenses incurred on behalf of Judy Little the sum of $3,500
d) For James G. Welch in behalf of his minor daughter, Frances Gail Welch, the sum of $2,100
e) For Benny B. Welch, for the death of his daughter, Sandra Welch, age 14, the sum of $17,250
The defendant, Camden Fire Insurance Association, has appealed, contending that the extension of its coverage to the 1958 Ford Tudor Sedan involved in the subject accident was erroneous and alternatively that the quantum of damages awarded to the plaintiffs was excessive, particularly with respect to the award to Benny B. Welch for the death of his minor daughter, Sandra Welch. Plaintiffs have not answered the appeal.
The primary question presented by this appeal is whether or not the 1958 Ford Tudor Sedan, owned by Mrs. Billy Gene Formby, and driven by Ray Karl Johnson was, on December 31, 1958, a temporary substitute automobile for the 1958 Ford Courier panel truck, owned by Johnson and Fred Baum, under the provisions of Camden's liability insurance policy. The said policy contained a provision which extended the liability coverage of the policy to an automobile other than that described in the policy itself, under paragraph IV(a) (3) as follows:
"Temporary Substitute Automobile under coverages A, B and division 1 of coverage C, an automobile not owned by the named insured or his spouse if a resident of the same household, while temporarily used as a substitute for the described automobile when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction;"
The principal facts pertinent to this issue are that in 1956 Ray K. Johnson and Fred Baum entered the vending machine business, with Baum furnishing most of the capital, and a location out of which to operate, and Johnson furnishing his efforts and experience in the vending machine business. At first Johnson did all the work of maintaining and servicing the machines and obtaining new locations. The business gradually expanded and in about January of 1957 they hired their first employee, Irving Camp, who started out on a part time basis servicing some of the machines. The business continued to grow and expand until by the early part of 1958 Irving Camp had become a full time employee, and likewise a part owner of some of the new routes. By June of 1958 the vending machine routes were being completely serviced by Irving Camp only, and Johnson began to devote most of his time to the operation of a lounge and other interests. At first Irving Camp was using an old 1948 Dodge or De-Soto to service the routes, but this became inadequate and consequently Johnson and Baum purchased the 1958 Ford Courier panel truck for use by Camp in servicing the *418 vending machine routes. However, this automobile, which will hereinafter be referred to as the Courier, was also used by Johnson when it was not being used by Camp as a routeman. In describing the extent to which he used the Courier, Irving Camp testified that he usually left the office in the Courier about 9:30 in the morning to service the routes and he would usually get back at 5:30 or 6:00 o'clock in the afternoon. Camp worked an average of five days a week. However, Camp explained that he owned only one personal car and two or three times a week his wife would want to use it so she would drive him to work where he would pick up the Courier and then that night he would drive the Courier back home where it would remain over night. When Camp was not using the Courier in the manner described it was used frequently by Johnson as a personal vehicle for pleasure or otherwise. This is clear from the testimony of several witnesses who saw him using the Courier.
In 1958 Johnson also owned a 1956 Lincoln, which was used primarily by his wife, Helen Johnson, as well as a 1958 Chevrolet pickup truck and the 1948 Dodge or DeSoto. The 1948 Dodge or DeSoto was apparently too old to be of any use and the 1958 Chevrolet pickup truck was apparently used only for hauling the heavy cigarette machines. So these two vehicles play no part in the present controversy.
About the end of October, 1958, Johnson and his wife separated and it was also about that time that he started using the 1958 Ford Tudor Sedan owned by Mrs. Billy Gene Formby, whom he had known for approximately two years and who considered him to be her "boyfriend". Mrs. Formby testified that after the Johnsons separated, Johnson needed another car because his wife kept the Lincoln and Irving Camp had to use the Courier in the vending machine business. Mrs. Formby testified she only "loaned" her car to Johnson although she admitted that "he gave me money from time to time, and there was no definite agreement made on that. Now some of the money that he gave me I paid payments, and some I used for my apartment rent and things of that sort, but there was no rental agreement of any kind made. It was just a loan, as I would loan it to anyone that I felt reputable." Under this arrangement Johnson used Mrs. Formby's car every day while she was at work and also frequently in taking her to and from her apartment in the evenings and in the mornings and occasionally he kept the car over night.
During the time that Johnson was using Mrs. Formby's car he had a heavy steel money box built and placed in the trunk thereof. Defendants' witnesses testified that this steel box was installed when Johnson separated from his wife about the end of October, 1958, to provide a safe place to keep his money in order to avoid seizure thereof by his wife's attorney in the divorce proceedings. Plaintiffs' witness, Mrs. Formby, testified that this steel box was not installed in her car until after Irving Camp wrecked the Courier on December 8, 1958, and that the purpose of the box was simply to provide a safe place to keep the money collected by Johnson from the vending machines after Irving Camp was disabled in said accident.
On one occasion, after Johnson and his wife separated, he borrowed a Chevrolet station wagon, belonging to Fred Baum's brother, in order to drive to Pennsylvania to look for his wife at her family's home. It is noteworthy that for this trip he did not use either Mrs. Formby's car or the Courier.
It was on December 8, 1958 that Irving Camp was seriously injured in an accident while driving the Courier on one of the vending machine routes, which he alone had been servicing for some time. Although defendants' witnesses testified that after Camp's injury, the vending machine routes were not serviced and the business "went to pot" it is our opinion that the evidence shows that Johnson did at least service part *419 of the machines, for which purpose he used Mrs. Formby's car. A man named Nathaniel Riley also helped to service some of the machines in Houston, but only Johnson and Irving Camp were familiar with the out-of-town routes and these were neglected.
It was about December 23, or a few days before, that Johnson decided to make the trip to Miami, Florida, to see his family and tend to "business" of an undisclosed nature. It perhaps should be noted that the vending machine business was not operated outside the state of Texas and consequently the trip to Florida had no relation to this business. Regarding the arrangements which were made to use Mrs. Formby's car for the trip to Florida, we find her testifying as follows:
"Q. How long before he left on the trip did you have occasion to discuss the trip, or did you discuss it with him on more than one occasion?
"A. I believe that we did. We discussed it several days before he planned to do down there. Whenever he made up his mind to go, we discussed it at that time, and then we discussed it some more. He had the 1958 Courier, but he couldn't use it because it was in the garage being repaired at that time, and he asked if I could do without my car while he was gone down there."
Johnson left Houston in Mrs. Formby's car about December 24, 1958, went to Miami, Florida, and was returning to Houston on December 31, 1958 when the accident occurred a few miles east of Lake Charles, Louisiana.
A review of the above stated facts, in the light of the temporary substitute automobile provision of the policy, quoted above, shows there is no question that two of the requirements of said provision are met, that is, the alleged substitute automobile was not owned by the named insured or his spouse, and the insured vehicle was withdrawn from normal use because of its breakdown. Therefore, the sole issues presented for our determination are: (1) Was the alleged substitute automobile being used only temporarily by Johnson? (2) Was the Formby car, at the time of the accident, being used as a substitute for the Courier?
As to the first of these issues, we have little difficulty in concluding that Johnson's use of the Formby car was temporary. Apparently there are no reported Louisiana cases on this particular aspect of the problem but counsel for the plaintiffs have cited McManus v. Home Insurance Co., 201 Wis. 164, 229 N.W. 537, in which the court stated:
"The word `temporary' has no fixed meaning in the sense that it designates any fixed period of time. It is a word used in contra-distinction to permanent. * * *"
Plaintiffs also cite Fleckenstein v. Citizens' Mutual Automobile Insurance Co., 326 Mich. 591, 40 N.W.2d 733 in which the court said:
"In construing the expression `temporary use' as employed in defendant's insurance policy, the meaning most favorable to plaintiff must be accepted. Pastucha v. Roth, 290 Mich. 1, 287 N.W. 355. As commonly accepted "temporary" is an antonym of "permanent." Plaintiff's use of the Chevrolet was either temporary or permanent. The record would not justify conclusion as a matter of law that plaintiff's use or his intended use of the Chevrolet was permanent. * * *"
Applying the above statement of the law to the facts of the instant case, it is clear that Johnson's use of the Formby car was temporary and not permanent. Mrs. Formby owned the car and it was used by Johnson only with her consent. Although Johnson used the car more than she did during November and December, the fact remains that she maintained control over it. She testified that if she and Johnson had "quit going together anytime, *420 I would have told him that I didn't want to let him use my car anymore." This was clearly not a permanent arrangement and must therefore be construed to be temporary in nature.
As to the second issue presented for our determination, that is, whether the Formby car was being used as a "substitute" for the Courier, we again find that there are no reported Louisiana cases on this specific point, but, in our opinion, the applicable law is correctly stated in the case of Western Casualty & Surety Co. v. Norman, 197 F.2d 67 (5 Cir.App.1952) as follows:
"* * * We consider controlling the absence of any evidence which can be said to establish that the Oldsmobile was, for the trip in question, used as a substitute for the Ford. * * * Under the terms of the policy the fact of substitution was essential to extend coverage. To authorize such extension the party claiming it should, (certainly when in his power, as here), adduce testimony which is sufficient to show, not only that the insured vehicle had been withdrawn from service because of a breakdown, but also that except for this the insured car would have been in use at the time and in the circumstances involved. Such showing is necessary to establish `temporary use as a substitute', i. e., a car put in place of another."
See also State Automobile Insurance Association v. Kooiman, D.C., 143 F.Supp. 614, 34 A.L.R.2d 950, Sec. 21.
In the case of Fullilove v. United States Casualty Company of New York, 240 La. 859, 125 So.2d 389 (La.S.Ct.1961) which incidentally is the only reported Louisiana case dealing with the temporary substitute automobile provision, the court was primarily concerned with whether the insured vehicle had been "withdrawn from normal use" because it had worn tires and another vehicle was used to make a long trip, but the court did define the word "substitute" as follows:
"The very term `substitute' connotes the replacement of one thing for another. In 83 C.J.S. p. 766 the word `substituted' is defined as follows:
"`It has been said that the word "substituted" describes a replacement of one thing by another, and in its ordinary sense and well-known meaning designates something placed in a position previously occupied by another thing, and implies the removal or elimination of the thing replaced, since something cannot be substituted for something else unless that for which the substitution is made is taken out and that which is substituted is inserted in its place.' (Emphasis ours.)"
Under the law set forth above, the precise issue presented in the instant case is whether on the date of the accident, December 31, 1958, Johnson was using the Formby car as a substitute for the Courier because it was in a garage undergoing repairs. In other words, if the Courier had not been disabled would Johnson have used it to make the trip to Miami, Florida. This is a very close factual issue. Impressive arguments have been presented by plaintiffs and defendant. Defendant argues persuasively that Johnson used the Formby car, whenever he desired, during November and December and that he could and would have obtained permission from Mrs. Formby to use it for the trip to Florida regardless of the condition of the Courier; that the Courier was a panel truck, specially suited for the vending machine business, with only a permanent seat for the driver whereas the Formby car was a passenger vehicle better suited for the trip for Florida; that the trip to Florida was in no way connected with the vending machine business; that the Courier had been used almost exclusively by Irving Camp in servicing the vending machine routes and had not been used by Johnson for making trips out of town for purposes not connected with the vending machine business; that on the one occasion when Johnson drove to Pennsylvania to look for his wife he did not use the Courier, but *421 instead borrowed another vehicle from Fred Baum's brother; that Johnson had installed the heavy steel money box in the Formby car to protect his money from seizure by his wife in the divorce proceedings and he therefore would have taken the Formby car and the money box therein to Florida, regardless of the condition of the Courier; that defendant's witnesses, who were Johnson's business associates and who testified that during November and December Johnson never used the Courier, even for personal reasons, were in a better position than plaintiffs' witnesses to know the extent to which Johnson used the Courier during this period of time.
On the other hand, plaintiffs argue persuasively that according to the testimony of plaintiffs' witnesses Johnson did continue to use the Courier for personal reasons, when it was not being used by Irving Camp to service the vending machine routes, although, during November and December, Johnson also used the Formby car. Plaintiffs argue that after Johnson separated from his wife he could no longer use the Lincoln and therefore the Courier was the only vehicle available to him for a trip such as the one to Florida. Plaintiffs' strongest argument is that Billy Gene Formby, whose car he used and who saw him the day he left, testified as follows:
"Q. How long before he left on the trip did you have occasion to discuss the trip, or did you discuss it with him on more than one occasion?
"A. I believe that we did. We discussed it several days before he planned to go down there. Whenever he made up his mind to go, we discussed it at that time and then we discussed it some more. He had the 1958 Courier but he couldn't use it because it was in the garage being repaired at that time and he asked if I could do without my car while he was gone down there. (Tr. 116, emphasis added.)

* * * * * *
"Q. Now with regard to the steel safety chest that was in the Ford that you mentioned before; was that chest in the car before or after the 1958 Ford Courier or station wagon was wrecked?
"A. It was put in the car after the Courier was wrecked.
"Q. Do you have any idea as to why it was put in the car?
"A. Yes, because Mr. Johnson didn't have the Courier to use and he was discussing the trip to Florida about the time that he decided to put the box in there and also he was going through his divorce proceeding and he wanted to have that for his personal use and his business use and he had no other car to use at that time. (Tr. 122.)
"Q. Which one would you say he used the most?
"A. Well, I don't know really, because this accident occurred right at the first of December sometime, and he tookhe used my car the latter part of November and when the accident occurred, well, he didn't have the Courier to use so I mean, I am sure that he took it as a whole and used mine the most because the Courier was in the garage. (Tr. 123)"
Plaintiffs contend that no one knew better than Billy Gene Formby whether Johnson used her Ford as a substitute for the Courier and that she stated clearly he used her car because he didn't have the Courier. Plaintiffs point out that Mrs. Formby was not shown to have any interest in this litigation whatsoever and that the jury apparently gave her testimony great weight.
Under the circumstances we are unable to find that the verdict of the jury was manifestly erroneous. This was a factual issue. It was very close and a determination *422 thereof involved the weight and credibility to be given to the testimony of the witnesses. Our jurisprudence is well settled that the findings of the jury, on issues of fact, will not be disturbed unless manifestly erroneous. Simon v. Texas & New Orleans Railroad Co., La.App., 124 So.2d 646; Sumrall v. Aetna Casualty & Surety Co., La.App., 124 So.2d 168; Martin v. Firemen's Insurance Company of Newark, N. J., La.App., 127 So.2d 328.
We now address ourselves to the issue of quantum. The law is well settled that in the assessment of damages, such as the ones sustained here, much discretion must be left to the trial judge or jury. McFarland et al. v. Illinois Central Railroad Company, 241 La. 15, 127 So.2d 183; Brown v. S. A. Bourg & Sons, Inc., 239 La. 473, 118 So.2d 891; Swillie v. General Motors Corporation, 133 So.2d 813 (3rd Cir.La.App.1961). However, our jurisprudence is likewise well settled, that awards made by the jury are subject to review by an appellate court and will be altered in the event of an abuse of discretion. McFarland et al. v. Illinois Central Railroad Company, supra. Furthermore, awards made in similar cases should be considered by our courts, so that a degree of uniformity will be maintained to the end that awards will not be out of all proportion, one with the other. Landry v. Southern Farm Bureau Casualty Ins. Co., 125 So.2d 474 (3rd Cir.La.App.1960).
Of those who survived, the most seriously injured was Sam Little, 44 years of age. Immediately after the accident, he was seen by Dr. Edmund G. Nagem who diagnosed a crushed chest, with multiple rib fractures, shock, multiple small bruises over the entire body and contusions of the liver and heart. Initial treatment consisted of infusions, transfusions and immediate surgery to place clips on the chest bones to hold them up so that the chest wouldn't cave in as the patient breathed. After about three days a tracheotomy was performed to aid breathing. Fluid developed in the lungs and Sam Little remained in a very critical condition for several weeks. By February 19, 1959 he had developed phlebitis (blood clots) in the legs causing them to be swollen. He was discharged from the hospital on February 27, 1959 and was semi-ambulatory at home for about two weeks thereafter, but was able to drive his car after being home for about six weeks. He continued under the doctor's care and enjoyed an excellent recovery from his very serious injuries, but he does have permanent residual effects of the accident. The multiple fractures and displacement of ribs resulted in a permanent weakness of the chest causing shortness of breath and chest pain on heavy exertion. Also, varicose veins resulting from the phlebitis cause both legs to swell on prolonged activity or standing. At the time of his injury he was employed as a gauger in the oil industry at a salary of $300 per month, and although he has returned to this employment, he is receiving a salary of only $250 per month and testifies that he cannot perform any of the strenuous duties connected with his job. The expert medical witnesses were of the opinion that he could still be gainfully employed in light work, but could not engage in heavy, strenuous activity.
Of the $27,500 awarded for Sam Little's personal injuries, approximately $4,000 is represented by the expense of doctors, nurses and hospitals, leaving $23,500 which may be attributed to his pain, suffering, disability and loss of earnings. In our opinion this award is not excessive.
The jury awarded $6,800 for Johnny Little of which approximately $800 was for medical expense. Immediately after the accident Johnny, 12 years of age, was also seen by Dr. Nagem who diagnosed a large v-shaped laceration of the scalp, bruises and swelling of the face, right leg broken near the ankle, dislocation of both ankles, three metatarsal bones broken in the left foot and a front tooth missing. He was confined in the hospital for a period of 16 days and didn't return to school for five *423 weeks following his release from the hospital. The scars on his head are covered by hair, and the missing tooth is replaced by a false one. He has residual effects from the fracture of his right leg in that an injury to one side of the growing end of the bone caused the ankle to tilt. For this condition corrective shoes were prescribed. The expert medical opinion was that after the bone stops growing surgery can be performed to correct this condition at a cost of approximately $650 for the doctors, plus the expense of about ten days in the hospital. The doctors estimated that Johnny has a disability of about twenty per cent to his leg and that he very likely will develop traumatic arthritis in the broken foot bones within three to ten years. Under these circumstances it is our opinion that the award of the jury for Johnny Little was not excessive.
The award for Judy Little, 12 years of age, was $3,500 of which about $250 was for medical expense. Immediately after the accident Dr. Nagem diagnosed Judy's injuries as a severe bruise on the face and a broken nose, causing both eyes and the nose to be black and swollen. After seven days in the hospital Judy was released. She still complains of headaches, for which the doctors can find no objective cause. However, the doctors did testify that as a result of the nose being broken in the accident, there is a "slight asymmetry" of the left nasal passage. The misalignment of the nose is noticeable only from an angle. Surgery could correct this condition, if desired, at a cost for surgical fees of about $500 plus three or four days in the hospital. Under these circumstances we are of the opinion that this award for Judy Ann Little is not excessive.
The jury awarded $2,100 for Frances Gail Welch, 12 years of age. Of this amount, about $100 can be attributed to medical expense. Immediately after the accident, Dr. Nagem diagnosed her injuries as a contusion of the right side of the face and the lip and severe sprain of both ankles. She was in the hospital three days and when seen again by Dr. Nagem on March 28, 1961 she had completely recovered except that her left ankle continued to give her pain on strenuous activity. As late as March 20, 1961, Dr. Schneider, a specialist in orthopedics, found that her left ankle was 3/8ths of an inch larger than the right due to calcification from the sprain and that although she had no disability she might have intermittent discomfort on strenuous activity for many years. Under these circumstances we find no abuse of discretion in the jury's award for Frances Gail Welch.
Defendant-appellant objects strenuously to the award of $17,500 to Benny B. Welch, for the death of his 14 year old daughter, Sandra Welch. The evidence shows that about one year after Sandra was born, her parents separated and she and her father went to live with her paternal grandparents in Hackberry, Louisiana. However, the plaintiff, Benny B. Welch, worked on drilling crews in the oil industry and was away from home most of the time so the care and maintenance of Sandra was left to her grandparents. In 1948 Benny B. Welch remarried and established a separate home with his new spouse, but he left Sandra to be raised by her grandparents. At the time of the accident Benny B. Welch was living in Sulphur, Louisiana, with his wife and three children of their marriage. Sandra had moved to Lafayette with her paternal grandparents. The plaintiff, Benny B. Welch, admittedly saw his child, Sandra Welch, only occasionally on holidays, week ends, etc.
In our opinion, the award of $17,250 is greatly excessive and out of all proportion to the awards which have been made in similar cases by the appellate courts of this state. In the recent case of Randall v. Baton Rouge Bus Co., 114 So.2d 98 (1st Cir.La.App.1959) awards of $15,000 were made to each parent for the loss of each of two children, age 7 and 3. These damages were reduced to $12,000 per parent per child with the court stating:

*424 "* * * The trial court awarded $15,000 for each child to each parent for their mental anguish and suffering, past and future, and their loss of companionship, love and affection, past and future. The award of damages in such instances is of necessity somewhat arbitrary and to some degree must be entrusted to the discretion of the trier of fact, although awards should be made so as to be comparable to those in similar instances, having due regard for the differentiations in factual circumstances of necessity present in different circumstances.
"Of course, no amount of money can compensate the parents for their tragic loss. But applying the above principles, we think that the awards for the mental anguish and loss of companionship of the parents, at the time of the accident and thereafter, should be reduced to $12,000 per child per parent, in order that the award herein be somewhat in accord with those made under similar circumstances. Watson v. McEacharn, La.App., 99 So.2d 138; Brooks v. State Farm Mutual Automobile Insurance Co., La.App., 91 So.2d 403; Himes v. Avinger, La.App., 85 So.2d 304."
In the Randall case the two children were the only issue of plaintiffs' marriage and a very close family relationship existed. Certainly it cannot be said that in the instant case the plaintiff, Benny B. Welch, has suffered as great a loss of companionship, love and affection, past and future, as the parents in the Randall case, and the cases cited therein. For instance, in Watson v. McEacharn, 99 So.2d 138 (2d Cir. La.App.1957, writ of certiorari denied) the court awarded $12,500 to parents for the death of their 20 year old son who earned $125 per week and made substantial contributions to the support of the family. In the case of Brooks v. State Farm Mutual Automobile Insurance Co., 91 So.2d 403 (2d Cir.La.App.1957, writ of certiorari denied) the court awarded $7,500 to the father, and $7,500 to the mother for the death of a normal affectionate 6 year old son. In the case of Himes v. Avinger, 85 So.2d 304 (2d Cir.La.App.1956) the court awarded $10,000 for the death of a 15 year old boy who was an excellent student and had a very close family relationship to his parents. In our opinion, an award of $7,500 to Benny B. Welch for the loss of his child, plus the funeral expense of $2,116.96, making a total of $9,616.96, is proper under the circumstances of this case.
For the reasons hereinabove set forth, the judgment appealed from is amended so as to decrease the award made to Benny B. Welch from $17,250 to $9,616.96. Otherwise than as herein amended, the judgment appealed from is affirmed. All costs of this appeal are assessed against the defendant-appellant.
Amended and affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.